LILLIAN SHERWOOD NEWKIRK ET ALS. *vs.* AARON B.
SHERWOOD ET ALS.

Third Judicial District, New Haven, June Term, 1915.

THAYER, RORABACK, WHEELER, BEACH and BENNETT, JS.

In an action to settle the title to a strip of land about eleven hundred
feet in length along the northern shore of Long Island Sound, the
parties were at issue as to whether the plaintiffs' southwesterly
boundary was mean high-water mark, as they claimed, or whether
the strip in dispute, varying from twenty to sixty-three feet in
width, consisted in part of a highway and in part of a public beach,
as the defendants contended. No evidence was offered of any
formal lay-out of a highway, but the defendants insisted that a
highway existed by dedication and user. The trial court, upon
conflicting evidence, found that no portion of the *locus* above high-
water mark had ever been used by the public as a highway. *Held*
that the subsidiary facts, upon which this ultimate finding rested,
were supported partly by the physical conditions disclosed to the
trial court upon its inspection of the premises, and partly by the
probability that the user testified to was below instead of above
high-water mark, and therefore the finding as to these facts would
not be disturbed by this court on appeal.

The trial court also found that if any such highway ever existed it had
been disused and abandoned for seventy years or more and had
reverted to the grantees of the original dedicators, and that the
plaintiffs and their predecessors in title since 1829 had been in the
continuous, exclusive and adverse possession of the entire *locus*.
*Held* that these findings were based upon competent evidence and
therefore must stand.

Several of the earlier deeds, in giving the southwestern boundary of the
*locus*, used the word "beach" to describe it. *Held* that in view of
the circumstances the trial court properly construed the word as
meaning the shore at high-water mark.

The word "beach" may be used to indicate the land between high and
low-water mark, or it may include the sandy shore above mean
high water which is washed by storms and exceptionally high tides.

The voluntary and intentional renunciation which is implied in the
abandonment of a highway, may be inferred as a fact from the
surrounding circumstances.

The facts in the present case briefly reviewed and *held* to warrant the
inference of an intentional abandonment of the use of the ancient
highway, if one ever existed.

Argued June 9th—decided July 16th, 1915.

Suit to quiet and settle the title to certain real estate in the town of Westport adjoining Long Island Sound, brought to and tried by the Superior Court in Fairfield County, *Burpee, J.;* facts found and judgment rendered for the plaintiffs, and appeal by several of the defendants. *No error.*

*John J. Walsh, John H. Light* and *Edward J. Quinlan,* for the appellants (defendants).

*William H. Comley, Jr.,* with whom was *Charles S. Canfield,* for the appellees (plaintiffs).

BEACH, J. This action, to quiet title to land, was brought against the defendants Elwood, who owned land adjoining the plaintiffs', the town of Westport, and John H. Light and others, as representing the general public.

The plaintiffs claim to be the owners in fee simple, as having title by deed and also by adverse possession. The plaintiffs' land is situated on the southwesterly side of Sherwood's Island in the town of Westport, and is described in the complaint as bounded northerly on the land of the defendant Fannie L. Elwood, easterly on the highway known as Island Lane, and southerly and westerly on Long Island Sound. The only controversy arises with reference to the bound on Long Island Sound, and the defendants' answers allege that the plaintiffs' land is bounded southerly and westerly on a highway, that the southern and western limit of the plaintiffs' ownership is marked by a stone wall north of the highway, and that the beach above high-water mark in front of the plaintiffs' land is a public beach. The plaintiffs' replies deny that the beach is public, deny that any highway ever existed, and allege that, if it did exist, it was abandoned before this suit was brought.

The strip of land thus left in dispute is about ten hundred and eighty-six feet long and from twenty-four to sixty-three feet wide. It is composed in part of a strip of sand scattered with stones and boulders next above high-water mark, from five to twenty feet wide, and in part of a bank rising abruptly from the sand and about seven feet above high water. The top of this bank is thirty-five feet wide at its widest point, and at other places the bank has been washed away by high tides and storms to the base of the stone wall.

No evidence was offered of any formal lay-out of a highway over the *locus*, but the defendants claimed that the highway exists by dedication and user. The evidence as to user was conflicting, and the trial court has found that neither the top of the bank nor the strip of sand above high-water mark has ever been used by the public as a highway.

We cannot disturb the several findings of subsidiary facts on which this finding of ultimate fact is founded. The testimony relied upon in support of the defendants' numerous exceptions to these findings is in part disputed, in part discredited by the physical conditions as found by the trial court after inspection of the premises, and in part explicable on the probability that the user was below, instead of above, high-water mark. The same is true of the testimony relied upon in support of the defendants' exceptions to the findings which lead up to the conclusion of the trial court that the land in dispute has never been and is not now a public beach. All of these exceptions to findings and to refusals to find are overruled.

The material questions of law on this appeal are those which arise from the fact that the old deeds through which plaintiffs claim title refer to a highway in front of a part, at least, of the plaintiffs' land. The finding shows that Sherwood's Island, so-called, is a body of

upland bounded on the west by salt meadows and facing on a continuous sand beach which extends in a northwesterly direction in front of Sherwood's Island and of the salt meadows to Compo Mill Pond. At its northern end Sherwood's Island is connected with the mainland by a bridge from which a highway, called Island Lane, runs southerly through the island and terminates at the beach. The defendants' claim is that the highway referred to in the old deeds was a continuation northwesterly of Island Lane toward the Compo Grist Mill.

Prior to 1720 the southerly end of Sherwood's Island was owned by several different proprietors, who afterward conveyed to one Daniel Sherwood, through whom the plaintiffs and the defendants Sherwood claim. Going northwesterly along the beach from the end of Island Lane, the four lots which fronted on the beach, in the order in which they are named, were known as the Couch lot, the Jesup lot, the Godfrey lot, and the Green lot. The Couch lot was conveyed to Daniel Sherwood in 1806, and was bounded easterly and southerly by highway, the easterly boundary referring to Island Lane. In 1794 the Jesup lot was conveyed to Daniel Sherwood and was bounded southerly by highway. In 1783 the Godfrey lot was conveyed to one Godfrey and bounded southerly and westerly on highway and on the Sound; and, in 1793, it was conveyed to Daniel Sherwood and bounded westerly in part on salt meadows and in part on the beach and southerly in part on beach and in part on lands of Couch and Jesup. These three lots, taken together, constitute the premises described in the complaint. The Green lot, which now belongs to the defendants Elwood and lies northerly of and next northwesterly on the beach to the plaintiffs' land, was conveyed to Daniel Sherwood in 1720 and bounded south on the

heirs of Couch and "only a small part on the beach."
It therefore appears from these deeds that about 1800
there was a highway extending northwesterly along the
shore from Island Lane in front of the old Couch and
Jesup lots and in front of a part, only, of the old
Godfrey lot; and no highway in front of the balance
of the plaintiffs' present holdings or in front of the
land northwesterly of the plaintiffs and now owned by
the defendants Elwood. No reference to any highway
along the shore front northwest of the Godfrey lot ap-
pears from numerous other deeds introduced, in all of
which the proprietors were bounded on the beach.

In 1829 Daniel Sherwood's estate was distributed,
and the four lots above named were set out to Franklin
Sherwood, his son, and bounded southerly and westerly
by the beach. This disappearance of the highway as a
southern boundary is noteworthy, because the dis-
tributors were freeholders of the town who had an
interest in the preservation of the highway, if any was
then supposed to exist. It is not improbable that the
old highway should have fallen into disuse after the
Godfrey and Jesup lots passed into the hands of Daniel
Sherwood, who already had an outlet to the eastward
on Island Lane; especially if the beach below high-water
mark afforded then, as the finding shows that it does
now, a strip of firm hard sand relatively free from
boulders, so that those who had occasion to go to the
salt meadows on the west or to the Compo Grist Mill
may have traveled below high-water mark. In 1842
Franklin Sherwood mortgaged the premises to the
town of Westport, bounding them southerly and west-
erly by the highway and the beach. This is the last,
and after 1806, the only, reference on the land records
to any highway southerly of the plaintiffs' land. In
1888 Franklin Sherwood distributed all his real estate
among his children, and for that purpose conveyed the

Green lot to his daughter, the defendant Fannie L. Elwood, and conveyed the old Couch, Jesup and God-frey lots to his son Arthur, the father of the plaintiffs, describing the latter tract of land as "containing two lots on the westerly side of the highway adjoining the beach and as the fences now stand and is bounded; northerly by my own land, easterly by highway, south-erly and westerly by the beach." Some stress is laid by the defendants on the words "as the fences now stand," and the claim is that they indicate an admission that Franklin Sherwood did not own or intend to con-vey anything south of the stone wall; but such a con-struction is inconsistent with the subsequent specific boundary on the west and south by the beach, and it is also unnecessary, for the reference to the fences as boundaries is satisfied by the division fences between the daughter's portion and the two lots conveyed to the son. In 1901 Arthur Sherwood conveyed the premises described in the complaint to his children, bounding the same southerly and westerly on Long Island Sound, and the title thereto is now vested in the plaintiffs.

It will be seen that for the last seventy years the land records make no reference to any highway south of the plaintiffs' land; and the trial court finds that, if there ever was such a highway, its *locus* has not been disclosed, and its use has been abandoned for a time beyond the memory of the oldest witness. It is also found that the *locus* is impassable, except for pedestrians, above high-water mark, and that such passing as there has been along the shore by pedestrians and teams has usually been along the beach below high water where the sand is firm and comparatively free from boulders, and that, so far as teams or pedestrians have traveled over parts of the premises above high-water mark, it has been with the license or permission of the plaintiffs

or their predecessors in title. It is also found that the plaintiffs and their predecessors in title, back to the distribution in 1829 of the estate of Daniel Sherwood, have been in the continuous, exclusive and adverse possession of all of the premises described in the complaint.

The defendants have excepted to the findings of subsidiary facts bearing upon the question of adverse possession, but an examination of the record shows that they are based on conflicting testimony, and the exceptions are therefore overruled.

On the findings as they stand, the court did not err in concluding that, if a highway ever existed in front of the plaintiffs' premises, it had been abandoned by long-continued disuse and had reverted to the grantees of the original dedicators. A highway is nothing but an easement. *Peck* v. *Smith*, 1 Conn. 103. The old common-law doctrine that there can be no loss of a public right in a highway by nonuser or by adverse possession has been modified. *Hartford* v. *New York & N. E. R. Co.*, 59 Conn. 250, 259, 260, 22 Atl. 37. "The desertion of a public road for nearly a century, is strong presumptive evidence that the right of way has been extinguished." *Beardslee* v. *French*, 7 Conn. 125, 128. In *Litchfield* v. *Wilmot*, 2 Root, 288, it was held that fifteen years uninterrupted possession of a highway would bar the town from recovering it. In *Brownell* v. *Palmer*, 22 Conn. 107, 121, it was apparently questioned, though not necessary to the decision, whether twenty years would be sufficient, but not doubted that a very long possession would prevail. In *Greist* v. *Amrhyn*, 80 Conn. 280, 285, 68 Atl. 521, it is said that "the length of time during which such nonuser must continue on the part of the public, before the highway can be presumed to be abandoned, has not been determined in this State by statute or judicial decision.

It must be a long time." Such an abandonment im-
plies, of course, a voluntary and intentional renuncia-
tion, but the intent may be inferred as a fact from the
surrounding circumstances; and in this case the in-
ference of an intentional abandonment of the use of
any ancient highway which may have existed in front
of the plaintiffs' land, was justified by the finding that
there had been no use of any part of the *locus* for a
highway within the memory of witnesses covering a
period of over sixty years; by the finding of an exclusive
adverse possession of the whole of the *locus* by the
plaintiffs and their predecessors in title since 1829, and
by the finding that, except by permission of the plain-
tiffs and their predecessors, such passing to and fro
as has continued within the memory of witnesses has
been upon the comparatively unobstructed strip of sand
below high-water mark.

The defendants also claim that the deeds which
bound the plaintiffs' grantors on the south and west
by the beach carry the title no further than to the
strip of sand between the high-water mark and the
upland. The word "beach" may be used to mean land
between high and low-water mark, or it may be used
to include a sandy shore above mean high water which
is washed by storms and by exceptionally high tides.
In this case the trial court has found that the grantors
used the word as meaning the shore at high-water
mark, and the facts as to adverse possession by the
plaintiffs' predecessors in title would so indicate. It is
also apparent, upon comparing the southern boundaries
of the Godfrey lot as described in the deeds dated 1783
and 1793, respectively, that the southern bound upon
the "beach" was used in the later deed as synonymous
with the southern bound upon the "Sound" in the
former deed. We think the court did not err in con-
struing these deeds as bounding the plaintiffs and their

predecessors upon the shore at high-water mark. There was no evidence of any grant or allotment of the beach above high-water mark to the early proprietors of the town. We think that the word "beach," when used as a boundary in these deeds, must be understood as conveying all the land on the shore down to high-water mark.

There is no error.

In this opinion the other judges concurred.