CITY OF NEW LONDON *vs.* THE PEQUOT POINT BEACH COMPANY ET AL.

Second Judicial District, Norwich, October Term, 1930.
WHEELER, C. J., MALTBIE, HINMAN, BANKS and AVERY, Js.

Argued October 21st—decided November 17th, 1930.

*Thomas E. Troland,* for the appellant (plaintiff).

*Frank L. McGuire,* for the appellee (defendant The Pequot Point Beach Company).

*Charles B. Waller,* with whom was *Robert P. Anderson,* for the appellee (defendant Lucius E. Whiton).

WHEELER, C. J.   Pequot Avenue is located southwest of the old United States lighthouse in New London.   The part of it from which the plaintiff claims it has been ejected lies south of a fence which runs westerly from the lighthouse property to the extension of Parkway which intersects Pequot Avenue from the north.   In 1878 the tract, including the portion which is the subject of this action, was owned by the Jerome heirs and extended along the shore southwesterly for nearly a half mile and for a considerable distance to the northeast. This portion is now divided into two tracts, one of which is in the possession of the defendant Lucius E. Whiton, and the other in the possession of The Pequot Point Beach Company.   The vicinity of this land was sparsely settled in 1878.   A highway known as Pequot Avenue ran from the northeast to the lighthouse, and at a considerable distance from the Jerome property a highway known as Town Hill Road ran from the northeast to the shore, but there was no established highway along the shore between these points.

Between 1864 and 1866, the plaintiff at various times had attempted to lay out a public highway along the shore between these points, but the layout was never legally completed.   The Jerome heirs on December 5th, 1877, executed a deed conveying to the plaintiff a

strip of land sixty-six feet wide, except for ninety-four feet from its starting point at the lighthouse and extending from its starting point to the extension of Parkway. This deed was delivered to the court of common council of the plaintiff accompanied by a letter from the plaintiff's city attorney; it voted to accept the communication and deed and to record the deed. This constituted a dedication by the owners so far as they were concerned; it would have been absolute but for a provision of the deed that it was granted, "On the sole condition that said city shall maintain a public highway over said conveyed premises, and shall also grade the bank or offset of earth on the west side at the southern end thereof, between said highway and the adjoining premises of grantors and further remove back the fence onto said division line." It does not appear that the plaintiff ever complied with the terms of this condition; but after the acceptance of the deed it built a road forty-seven feet wide over that portion of the strip conveyed which lies northerly of the present southerly fence line of the existing traveled highway, and the public entered upon and has ever since used this road for the purposes of public travel. The road thus used was and is approximately forty-seven feet in width between these two points. The land on which the road was built is located on the edge of a bank leading abruptly to the sandy shore of Long Island Sound. Before the portion of the highway comprising nineteen feet of the land conveyed by this deed and lying south of the forty-seven feet used for a road could be used as a part of this highway it would have been necessary to extensively grade and fill and to build a seawall to protect it from the tides. No part of the highway as built by the plaintiff ever extended south of this fence line, and no highway has ever been built upon these nineteen feet and no part of it used for

highway purposes by the plaintiff or the traveling public.

The failure of the plaintiff to carry out the conditions, within a reasonable time, upon which the grant of dedication of the entire sixty-six feet strip was made would have justified the then owners claiming a revocation of the grant. The defendants have, however, acquiesced in the use by the public of the forty-seven feet strip upon which the plaintiff built a road and this continued use ever since by the public with the knowledge and acquiescence of the Jerome heirs and their assigns would constitute a dedication to this public use of this forty-seven feet highway. So far the defendants do not controvert the fact of dedication on the part of their predecessors in title. *Kent* v. *Pratt,* 73 Conn. 573, 574, 48 Atl. 418. The intention of the owner to dedicate, whether made expressly, or implied from long continued use, will not suffice in this jurisdiction to constitute the land so dedicated a public highway until there has been an acceptance of it by the unorganized public. Had the grant in this case been an absolute one, in the ordinary case acceptance must have been established by its user by the public for a long time and the user by the public of a part of the length or width of the highway would not have constituted a constructive acceptance of the unused part of the highway. But there may be a constructive acceptance of one portion of a highway by the actual use and acceptance of another portion. In *Hall* v. *Meriden,* 48 Conn. 416, 430, we said: "While therefore we would not hold that there may not be a constructive acceptance of one portion of a highway by actual use and acceptance of another portion, yet we think such constructive acceptance can exist only in a peculiar case like that in *Derby* v. *Alling* [40 Conn. 410], where by reason of the formal character of the proceedings attending the dedi-

cation and designation of the streets and acceptance by the town, and the fact that the street as to which the question arises is a part of a net work of streets, a special and unusual effect is to be given to such actual use of a portion of the streets as it made by the public."

Acceptance and dedication rest upon the principles of the common law. We held in *Guthrie* v. *New Haven*, 31 Conn. 308, 321: "These principles authorize the gift, estop the giver from recalling it, and presume an acceptance by the public where it is shown to be of common convenience and necessity, and therefore *beneficial* to them. For the purpose of showing that it is beneficial, an express acceptance by the town, or other corporation within whose limits it is situate, and who are liable for its repair, the reparation of it by the officers of such corporation, or a tacit acquiescence in the open public use of it, are important; and so are the acts of individuals, such as giving it a name by which it becomes generally known, recognizing it upon maps and in directions, using it as a descriptive boundary in deeds of the adjoining land, or as a reference for locality in advertisements of property, etc., and any other acts which recognize its usefulness and tend to show an approval of the gifts by the members of the community immediately cognizant of it; but the principal evidence of its beneficial character will be the actual use of it as a highway, without objection, by those who have occasion to use it for that purpose."

In the case before us the grant, exclusive of the conditions, definitely describes the plot of ground by metes and bounds. The council had before it this description and the letter of its city attorney, and it voted to accept the deed and to record it, and thereupon built the road forty-seven feet wide, and since that time it has been used by the public. The road, at least for its used width, was manifestly of public con-

venience and necessity. It provided access by the public to the shore where there was no other way of reaching it within a reasonable distance. The sparsely settled character of this locality made it unreasonable to expect the plaintiff to work the full width of this road or the public to use it. While the acceptance cannot be found from the vote of the town, the benefit to the public may be inferred from that vote. These facts and this situation, by themselves, had they remained thus until, in 1889, a fence was built along the southerly side of this road, might have constituted the exceptional case for the inference of an acceptance of this road and of the width as granted. But the court has found that the land south of this fence line has been exclusively occupied by the Jerome heirs and their successors in title. The court has also found: "At no time from the date of the acceptance of the deed . . . and the building of the first road down to the date of trial did public convenience and necessity require for public travel the use of land south of this fence line either as incidental to the use of the existing highway to the north or otherwise." In view of these findings we cannot hold that the road for its entire width was of common convenience and necessity or of benefit to the public, as a consequence we cannot hold that there was an acceptance of the road for the sixty-six feet width as granted. A further reason for this holding is the failure of the plaintiff to carry out the conditions upon which the grant was made, and the acquiescence of the Jerome heirs in the use by the public of the forty-seven feet strip. Neither these heirs nor their successors, upon this finding, have ever acquiesced in the use by the public of any portion of this sixty-six feet strip south of the fence line.

The trial court held, and the defendants stoutly maintain, that whether or not there was an acceptance

there was an intentional abandonment by the unorganized public and by the plaintiff of all the rights they were possessed in the land in dispute. Abandonment in this jurisdiction is a question of fact. *Richardson* v. *Tumbridge*, 111 Conn. 90, 149 Atl. 241. It implies a voluntary and intentional renunciation, "but the intent may be inferred as a fact from the surrounding circumstances"; *Newkirk* v. *Sherwood*, 89 Conn. 598, 605, 94 Atl. 982. "The length of time during which such nonuser must continue on the part of the public, before the highway can be presumed to be abandoned, has not been determined in this State by statute or judicial decision. It must be a long time." *Greist* v. *Amrhyn*, 80 Conn. 280, 285, 68 Atl. 521. A road "cannot be curtailed in its width by the encroachment of the adjoining proprietors without unmistakable evidence of abandonment on the part of the town." *Appeal of St. John's Church*, 83 Conn. 101, 105, 75 Atl. 88. A large body of facts has been found by the court, which the defendants assert present a continuous series of affirmative acts from the date of the acceptance of the deed by the plaintiff, clearly indicating an abandonment of all interest in the part of the highway in dispute. These acts are: 1. The nonuser of the part of the highway south of the south line of this road. 2. The claim of ownership, occupation and acts of ownership by the Jerome heirs and their successors. 3. Acts which constitute the plaintiff's recognition of such ownership; the principal of these we now cite in the order in which they appear in the finding.

On November 1st, 1880, the Jerome heirs leased land in part on the south side of this traveled way to Ockford and another, who erected an amusement pavilion on the westerly end of this land, and also one hundred and fifteen bath houses, all within two feet of this fence line and extending westerly from a point

within fifty feet westerly of the lighthouse property four or five hundred feet, a part of the houses being in the same location as the present bathing houses maintained by the defendant The Pequot Point Beach Company. All of these buildings were maintained by the Jerome heirs for five years and their construction and maintenance was known to the plaintiff and the public who acquiesced in their location and made no effort to have them removed. The plaintiff, during the period of the lease, supplied water to these buildings and Ockford and another paid the plaintiff for the water so furnished. April 1st, 1885, the plaintiff duly filed in its land records a lien for water so furnished the lessees in which it described the buildings as standing upon the land so leased. The Jerome heirs being indebted to the plaintiff for water furnished, on February 19th, 1886, the plaintiff filed a water lien on its land records in which the buildings were described as standing upon land belonging to the Jerome heirs. In 1887 the common council of plaintiff voted that Pequot Avenue at the point in question be graded for its full width and appropriated $1000 for that purpose. No grading was ever done south of the present southerly fence line. In 1886 Lynch succeeded to the ownership of the property on both sides of this traveled highway. From 1889 to 1902 a fence existed on the present southerly fence line. In 1902 Lynch erected a new fence substantially on the line of the old fence posts which continued to the date of trial. Part of this time Lynch maintained signs on the land south of this fence and at a later time, but prior to 1923, similar signs upon the fence. Neither the public nor the plaintiff objected, during Lynch's ownership, to the maintenance of these fences or to the occupancy by him of the disputed land. In 1896 an engineer prepared for Lynch a map depicting the then-existing fence and it was recorded

upon the land records of the plaintiff. In 1902 Lynch made extensive improvements and built a mansion house on the land south of the fence, including driveways, curbing, coping and a substantial seawall to protect his house, portions of which were built on the land in dispute. Shortly thereafter Lynch built a private sewer connecting with the out-fall sewer running from Parkway and to protect it built a substantial stone wall on the land in dispute five feet south of the fence line and filled in all the space between the fence line and the wall with stones and loam. Later a portion of the wall washed away by the sea was replaced by Lynch and the wall has ever since so remained. In 1902 Lynch planted a hedge upon the land filled in by him along its entire length between the fence and the stone wall. A portion of this hedge on land now occupied by bath houses of The Pequot Point Beach Company has been removed, with this exception the hedge still exists. In 1902 Lynch erected a fence on the north side of this highway placing it upon a curved line somewhat north of the line described in the deed of the Jerome heirs. He engaged an engineer to prepare a map showing the locus and the northerly and southerly curved lines of the fence along this highway. Lynch delivered to the plaintiff this map with a communication from his attorney in which it was proposed that Lynch exchange with the plaintiff land to the south of the proposed north line for land south of the proposed south line as indicated on this map. The court of common council of the plaintiff appointed a committee to consider the exchange. It reported favorably and the common council voted to accept and adopt the report and at this meeting appointed a special committee for the purpose of discontinuing the portion of Pequot Avenue south of the southerly fence line and widening and extending the northerly line of this avenue, as shown

upon this map. There is no record of the action of this special committee and no record of further action by the plaintiff or Lynch in this matter, but Lynch did not move back the fence on the north side of the traveled way as proposed but it was left where he had already established it in 1902. The land thus enclosed by a fence on the north side of the traveled way has been used by the public ever since as a portion of the highway while Lynch has continued in uninterrupted possession of the land in dispute south of the southerly fence up to the time of his death in 1917.

The section of New London in the vicinity of the disputed highway is called Pequot Colony. In 1904 the sewer system in this section needed to be improved. The court of common council by vote instructed the engineer of the board of sewer commissioners of plaintiff to take immediate steps to examine into and relieve the difficulties in the system of sewerage in this colony. The engineer recommended in 1905 to this board a plan which involved in part the acquisition of the Parkway out-fall sewer owned by Lynch which emptied into Long Island Sound and extended over the beach property south of Pequot Avenue owned by Lynch. Subsequently Lynch offered to transfer this sewer and one on Greenwood Avenue to the plaintiff and the board accepted the proposal and Lynch transferred to the plaintiff all his interest in the sewer pipes laid in Parkway and Greenwood Avenue and leased to it for five years the right to maintain this out-fall sewer under his beach property southerly from Pequot Avenue to low-water mark. The board accepted the deed and lease and these were duly recorded in plaintiff's land records. Pursuant to this lease plaintiff built upon Lynch's land a new out-fall sewer, extending it to the Sound and connected the Parkway system of sewerage with it and these two have been used ever

since by the plaintiff while Lynch disconnected his private sewer from the old out-fall sewer and connected it with the new out-fall built by the plaintiff. This private sewer was located upon the land in dispute.

The northerly boundary line of the strip so leased is the southerly fence line of Pequot Avenue. At or about the time of the making of the lease, the sewer department of plaintiff made certain maps for the board in assessing benefits for the sewer construction, and these show the southerly fence line as the division line between the highway and the land in dispute. The assessment was made against Lynch in 1906 on the basis of his frontage and the area of his land between the fence line and Long Island Sound. The sewer board held hearings to hear protests against the making of the levy, and maps showing this highway line and the areas were on display at that time. Lynch appeared and said he offered no objection to his own assessment.

At the sewer assessment proceedings against the Jerome heirs in 1915, maps showing this location were used upon which the fence line appeared as the southerly line of Pequot Avenue. The owners of adjoining property were compelled to pay to the plaintiff a charge based on the area between the southerly fence line of Pequot Avenue continued westerly and a line one hundred feet south thereof. These assessments were paid to the plaintiff and the maps so used became and were a part of its public records. Lynch built his private sewer with the full knowledge and acquiescence of the plaintiff and the public records of the plaintiff contain maps showing the location of this sewer, all of which it knew.

In bettering its tax assessment situation the plaintiff caused maps to be made of the Pequot section. These define the southerly fence line of Pequot Ave-

nue in front of the property in question as the southerly line of Pequot Avenue and all assessments for taxes against the Lynch estate and these defendants on property south of this fence were based on these maps and the estate paid the taxes so assessed. At an auction on June 2d, 1923, of property of the Lynch estate near the lighthouse, the defendant Lucius E. Whiton purchased the Lynch residence and adjoining property and gave back a mortgage describing as the northerly line thereof the southerly fence line of Pequot Avenue. Whiton contracted to convey to Melcer acting for the organizers of the Pequot Point Beach Company this land up to the fence. Melcer went into possession. Prior to the incorporation of this company Melcer, acting for his associates, applied to the common council of plaintiff for a permit to erect bathhouses on Pequot Avenue which was granted. Melcer went over the matter with the officials of the plaintiff and they pointed out that the bathhouses would be built over a portion of the out-fall sewer. At these conferences the parties had before them a plan showing the sewers and the southerly line of Pequot Avenue which was located on this fence line. Melcer told the officials where the bathhouses would be built and the city engineer ascertained that between the street line and the pipe line there was room enough to build the foundation walls. After this The Pequot Point Beach Company began their building and completed the bathhouses at an expenditure of $6500, and pending their construction the building permit was granted and the lines for the sidewalk laid as designated by the plaintiff having for its southerly line this fence line. Pending the construction, application was made by the contractors to connect the bathhouses with the water mains of the plaintiff and the same was granted.

After the completion of the bathhouses the plaintiff, through its city manager and city engineer, endeavored to acquire from the defendants the right to maintain its Parkway out-fall sewer over the beach property south of the southerly fence on Pequot Avenue as the lease from Lynch had expired in 1910. During all of the many conferences which ensued the city officials raised no question as to the defendants' title to and right to maintain the out-fall sewer over the land now in dispute.

The officials and the defendants agreed, subject to approval by the counsel of plaintiff, that the defendants would deed to plaintiff the permanent right to maintain such out-fall sewer in consideration that plaintiff (a) would maintain, without cost to defendant Whiton, the six-inch sewer line from the Lynch house to the out-fall sewer near the westerly end of the beach and on renewal of the six-inch sewer to relocate it without cost to Whiton or the owner of the beach property, or assessment against them, (b) extend out-fall sewer four hundred feet as soon as possible and (c) grant to Beach Company the right to connect with this sewer and out-fall without further cost. The council authorized the city manager to enter into such contract, which he later executed.

The plaintiff subsequently applied to the United States Government for permission to extend the Parkway out-fall sewer into the Sound and accompanied its petition with a map showing the lines of Pequot Avenue as shown on the maps heretofore referred to. Subsequent to this contract many extensions to the Parkway out-fall sewer were made considerably increasing the sewage carried through it. The out-fall sewer was extended in 1928 pursuant to this contract four hundred feet and it was maintained for this distance at the time of the trial across the land of the

defendants running from the fence line to and into the Sound. Ever since its execution the plaintiff has exercised and now exercises the rights given it under this contract and has made no effort to modify or cancel it. None of the members of the council had, at the time, any actual knowledge of the location of the southerly line of the property described in the deed of the Jerome heirs, but every member thereof saw the construction of the bathhouses in process from the beginning and knew their exact location in reference to this fence line as did the highway commissioner, the city manager and the city engineer. When Whiton purchased from the Lynch estate and when he sold to Melcer and his associates and The Pequot Point Beach Company, he believed that the southerly fence line was the boundary line between Pequot Avenue and the Lynch property. All of the improvements made by the defendants on the property in dispute were made with the consent and acquiescence of the plaintiff and they believed at that time that they had absolute title to the property in dispute. From 1878 down to the trial the defendants and their predecessors in title were in open and visible possession of the property in dispute bounded northerly by this fence and running to the water, under the claim that they were, successively, the absolute owners of this property. The nonuser by the unorganized public and the adverse possession by the defendants and their predecessors since 1879 to date of trial would be, in any case, in the absence of adequate circumstances in explanation, strong evidence of abandonment; in this case, it is so convincing and the absence of explanation so complete that a court could not fail to find the abandonment by the unorganized public of its right to use the land in dispute for highway purposes. But when there is coupled with this extended series of acts, conduct and knowledge on the

part of every departmental head of plaintiff who would be apt to have charge of or knowledge of this matter, when there are repeated instances where the court of common council, in highest authority, acquiesced, directed and contracted with full knowledge of the possession by the defendants and their predecessors under claim of right, when the council, in behalf of the plaintiff, has entered into contract with these defendants for the permanent lease of the disputed land and still retains the valuable rights which the contract gave it, we are of the opinion that not only do these facts furnish "unmistakable evidence of abandonment" justifying the conclusion of the court in finding it, but that they require us to hold, as matter of law, that there has been an abandonment by the unorganized public of any right which the public may ever have had over the land in dispute. The circumstances of estoppel are so persuasive as to be decisive.

The first ruling on evidence assigned as error is the offer of the vote of the council of the plaintiff to record in 1905 the record of the adjourned meeting of the council of September 15th, 1902, the report of the special committee appointed at the regular meeting for the purpose of discontinuing a portion of the highway, etc. The offer appears to have been made to show action of the council irrespective of whether it was legal or not, indicative of their interest in this matter, and an attempt to show that Lynch obtained, by the exchange, land of the plaintiff. Neither the report of the special committee nor the vote are before us, and it is impossible to understand from the record, so far as printed, what the offer is, or to rule definitely and intelligently upon it. If the matter relates to the discontinuance of a portion of Pequot Avenue, to which we have earlier referred, it was not admissible to prove the legal action taken by the former council by having

a later council amend its record, since that was not within. the jurisdiction of the council of 1905. *Gilbert* v. *New Haven,* 40 Conn. 102.

But if the offer was, as we assume it to have been, to indicate the interest or intention of the council of 1905 and its members, in relation to this matter, it may have been admissible in view of the very broad findings made, but in any event its exclusion for any purpose was a harmless error. If admitted it could not, in the mass of evidence, oral and documentary before it, have affected the result reached by the court.

The admission of the sewer assessment roll and map used in the sewer assessment proceedings is assigned as error. The board of sewer commissioners had control of all sewers and had power to adopt plans to make assessments against persons whose property was found to be specially benefited. The council by vote instructed the engineer of this board to take steps to relieve the difficulties in the system of sewerage in Pequot Colony. He made recommendations to the board which were accepted and which included an attempt to have Lynch transfer his Parkway sewer to plaintiff. Lynch transferred his interest in the sewer pipes in Parkway and leased to the plaintiff the right to maintain the out-fall sewer under his beach property southerly from Pequot Avenue to low-water mark. The board accepted the lease and conveyance and the plaintiff entered upon the Lynch property and built a new out-fall sewer. The northern boundary line of the strip leased is the southerly fence line of Pequot Avenue. Thereafter the plaintiff instituted a special proceeding for the purpose of imposing the cost of these improvements on owners of property on Pequot Avenue and its area, and the cost was assessed on Lynch based on his frontage and the area of the lot south of the southerly fence line of Pequot Avenue.

This tended to prove the recognition by the plaintiff of Lynch's title to the disputed land and the intention of the parties and was admissible both upon the issue of acceptance and of abandonment as was every circumstance relevant and material to these issues. The map made for the purposes of making the tax assessments was one of the steps in proof that the land in dispute had been taxed against these defendants and their predecessors. The map also showed that all the land south of the fence, including the disputed land, had been taxed. This evidence was clearly admissible upon the issues of acceptance and abandonment.

We have examined the reasons of appeal which seek to correct the finding by striking out eight paragraphs and parts of two others. None of these findings were made in violation of § 11, page 309, of Practice Book.

Some paragraphs of the draft-finding might properly have been included in the finding; none of these would have been so vital as to have compelled a substantial change in the finding or in the conclusions reached. We find no harmful error in any of the assignments in refusing to find paragraphs of the draft-finding. As a whole the finding seems to us fair and to have been prepared with great care.

There is no error.

In this opinion the other judges concurred.