[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This case is about a road. In 1731 Abner Banning gave land to the Town of Hartland 135 rods in length for it to use as a public road going primarily north and south. The Town accepted the land and built a road on it which came to be known as the Pel Daniels Road.[1] One hundred thirty-nine years later, in 1870, the Town and its Selectmen voted to discontinue the road.[2] One hundred thirty years thereafter, in the year 2000, the owner of 85 acres of land abutting much of the eastern side of the southern 2300 feet of that road now asks this court to determine whether that discontinuance was valid. It is undisputed that the Town today maintains approximately .23 miles of the southern end of the road as a public road. It is also undisputed that the portion of the road north of the plaintiffs' property is no longer a public road. This CT Page 6451 court must decide whether the remaining approximately 1,450 feet of that road, from the end of the paved and maintained public road north to the northwest corner of the plaintiffs' property, was properly discontinued.[3] The evidence on that question is contradictory and ambiguous. For the reasons stated below, the court finds for the defendants.
The parties tried this case before the court on divers days in August and September of 1999. After completion of the trial transcript, submission of trial briefs, and final argument, the court now enters judgment for the defendant.
The central point in contention revolves around the location of the southern terminus of the discontinued road as the "road" or "highway" "from Richmond Bannings North," as it was so described in the vote of both the town meeting and the discontinuance resolution passed by the Hartland Board of Selectmen in 1870.[4] It is undisputed that one Richmond Bannings owned land and a homestead in that year bordering the east side of the Pel Daniels Road. The Pel Daniels Road ran from Old Town Road north until it intersected with a road shown on a map of Hartland in an 1869 Atlas of Hartford County (Plaintiff's Exhibit D) as going from "L. Emmons" homestead west and then northwest to the "Wm Roberts" homestead and then north to the Massachusetts border. The land owned by the plaintiffs today roughly approximates the land owned by Richmond Banning then, with the exception of two small parcels of land (one acre and ten acres) since conveyed out and the possible exception proposed by the defendant's expert that Richmond Bannings also owned additional land south of the plaintiffs' current property abutting the road and extending south to Old Town Road.
The parties and their experts variously contend that this language means that the southern end of discontinued road was (1) the northern edge of Banning's property, or (2) the southern edge of the Banning property, or (3) the actual Richmond Banning house, which was on the eastern side of the road approximately 300 feet north from the southern tip of his property.
The plaintiffs assert that "from Richmond Bannings North" is the language of abutment and that the southern terminus of the discontinued road must therefore be north-most boundary of Banning's land. Under this theory, all of the road south, from that northern tip of what is today the plaintiffs' property, is still a public road. The defendants assert that while this might be language of abutment, it is also ambiguous, and that other evidence shows that the intent of the discontinuance votes was to discontinue the road at either the southern edge of the Banning property, or possibly even further south than that if Banning or a family member, as the defendants' expert believes, in fact owned land abutting CT Page 6452 the road all the way down to Old Town Road. The Town also argues that "from Richmond Bannings North" might also mean from the Banning Homestead, today occupied by David Barrett.
For a variety of reasons, the court finds the defendants' arguments are more persuasive. While the defendants' own expert agreed that the terminology "from Richmond Bannings North" used the language of abutment, the question is still — abutting what? While it may have been common in the 1800s, as the defendants' expert testified, to use abutting properties in land descriptions, the language does not say "the property of Richmond Bannings." Richmond Bannings also owned a house on Pel Daniels Road that is distinctly marked on the map of Hartland in the 1869 Atlas of Hartford County (Plaintiffs' Exhibit D) and the 1870 of Map of the Hartland Business Directory (Plaintiffs' Exhibit C) while the boundaries of his entire property is not.
The discontinuance language adopted by the October 3, 1870, town meeting and in the October 22, 1870, resolution of the Board of Selectmen identified the other ending points of the roads being discontinued with reference to a homestead. The first road discontinued in the 1870 town meeting and resolution ran east and west. The town vote described this road as "the Highway commencing at Henry A. Browns to the road near Jeremiah Emmons." The board of selectmen described it as consisting of two segments: "[1] the Highway commencing near Henry A. Browns House running east to the Pel Daniels road so called [2] Also the Highway from said Pel Daniels road east to the North and South road near Jeremiah Emmons' it being the Shipman road. . . ." As the attached picture, Figure 1,* taken from the 1869 Hartford County Atlas shows, that language aptly describes two segments of a road intersected in the middle by the Pel Daniels road with the homesteads of H. Brown and J. Emmons near the road's two terminal points.
The descriptions of the Pel Daniels road in the town vote and Board resolution also used homesteads to describe the northern end of the road. Both the town vote and the Board resolution identify the road begin discontinued as going from Richmond Bannings North to "the Road coming from Leverett Emmons to Roberts" (Town vote), or to "the Road running past Leverett Emmons to the William Roberts place" (Board vote). The 1869 Hartford County Atlas (depicted in Figure 2)** identifies a "Wm Roberts" homestead located just south of the Massachusetts border on a road coming from that border and headed in a general south, then southeast, then easterly direction to the "L. Emmons" homestead located on the same North-South Shipman Road referred to in the discontinuance of the first road.
In all these instances, the board resolution varied the language of the CT Page 6453 town vote by using language the selectmen apparently regarded as synonyms for the terminology in the town vote. Under the presumption of regularity — "that the defendant, as a public body, had properly performed its duty and had acted in conformity with the requirements of law"; Scovil v.Planning Zoning Commission, 155 Conn. 12, 19, 230 A.2d 31 (1967); this court may assume that the board of selectmen was aware and intended to comply with legal requirements in carrying out its official duties. In the absence of contrary evidence, this court thus assumes that the board was aware that, for the discontinuance to be effective, the description of the road being discontinued in its resolution must be "in conformity to the recited vote" of the town; Greist v. Amrhyn, 80 Conn. 280, 289,68 A. 521 (1907); and that the board thus varied the terms because it regarded them as interchangeable with the terminology used in the vote of the town meeting. For the east-west road, "the highway commencing at Henry A. Browns" became "the Highway commencing near Henry A. Browns House." For the northern terminus of the Pel Daniels road, the "the Road coming to coming from Leverett Emmons to Roberts" became "the Road running past Leverett Emmons to the William Roberts place." Not so, however, for the Richmond Banning language. For this language, we are left to reviewing extrinsic evidence in attempting to determine what the town vote and board intended when it referred to "from Richmond Bannings."
The plaintiffs' expert Fentner stated that road discontinuances in the 1800s were typically of entire roads from beginning to end (Transcript of 8/26, p. 138 [hereafter, "T"]). He also acknowledged, however, based on his own review of town minutes and town meetings, that although towns had
 to describe the road in some way that it was determinable, so you could figure out from the minutes what roads they're talking about. Generally they don't do that very well but — usually there is some sort of a description that you can, somewhere along the line, interpret to a road.
(T, 8/26, p. 128). If a town did not discontinue an entire road, he testified that "they normally go from specific points, from property line, from an intersection, from some landmark" (T, 8/26, p. 138) or from a monument. In view of the above references in the town discontinuance language to other homesteads that the maps in the 1869 Hartford County Atlas and 1870 Hartland Business Directory show then existing, it is certainly possible that the language "From Richmond Bannings" may well have been intended to signify either from his homestead or from the southern tip of his property below his property.
The court thus finds the language used to describe the southern CT Page 6454 boundary of the discontinued Pel Daniels road to be ambiguous, so much so that the language alone does not resolve the question. The court takes comfort that the other three experts in this case, two from the plaintiffs and one from the defendant, also concluded that language was ambiguous.[5]
From what portion of Richmond Banning's house or property did the discontinuers intend the southern terminus of the discontinuance to begin? With this question, as with any question in construing ambiguous land descriptions, one must ask what did they intend? In so doing, the court may also consider the surrounding circumstances of the time and the situation of the parties at that time. Lake Garda Improvement Assn. v.Battistoni, 160 Conn. 503, 511-513, 280 A.2d 877 (1971). Factors the court has considered here include the following:
1. The most important source of historical information about Hartland's people and their homes during the 18th and 19th centuries is the GainesNotes (Plaintiffs' Exhibit H) compiled by David N. Gaines and two maps deriving from those Notes. Through research, review of deeds, discussion and correspondence with present and former residents and their descendants, and his own personal knowledge, Gaines compiled a lengthy collection of typed notes about Hartland of that era. In 1911, along with Correll H. Tiffany he released a map showing the location of homesteads, mills, highways and discontinued roads from the earliest times until 1911 in Hartland. (Plaintiffs' Exhibit E.) It referred to and identified by location and index number the various homesteads discussed in the GainesNotes. This map was based on Gaines' prodigious research. The Tiffany-Gaines index map was prepared in a day when living witnesses would still have had memory or traditionary evidence of the occurrences of 1870. Significantly, as depicted in Figures 3*** and 4****, that map shows the Pel Daniels road (although not so named) as having been discontinued from homestead 134 (which the Gaines Notes identify as the Banning homestead) northerly to the Massachusetts border.
2. In 1954, David Ransom sketched a "Key Map of East Hartland Homesteads to 1911". (Appendix F) Ransom based his map on the Tiffany-Gaines index map, which he updated on his sketch by showing which houses were still standing. Ransom also drew the location of main and discontinued roads. For Pel Daniels road, the Ransom map shows, as depicted in Figures 5***** and 6******, that by 1954 the public road went slightly past Homestead 134 on the southern end of the road, and then shows the road as discontinued north to the Massachusetts border. This depiction is consistent with evidence which established that the town now maintains the road approximately 30 yards past the Barrett homestead. These revisions of the 1911 Tiffany-Gaines map show that Ransom's map, both as to the current condition of historical homesteads CT Page 6455 as well as the Pel Daniels road, was based on then current information as well as historical data, rather than merely restating the 1911 data. Hence it also shows that, 73 years after the 1870 votes of town meeting and board of selectmen, the road was still regarded as having been discontinued.
3. The 1869 Hartford County Atlas map of Hartland showed the Banning homestead as a landmark sufficiently notable to be identified in that year. Similarly, the 1870 Map of the Hartland Business Directory also included the location of the R. Banning homestead, as it did the four other homesteads referred to in town vote and Board resolution (H. Brown, J. Emmons, L. Emmons, and Wm. Roberts). From the 1869 and 1870 maps, it is obvious, and the court finds, that a discontinuance resolution referring to the Banning homestead would have meant, to people of that day, a specific location. It would been a landmark known to all Hartlanders.
4. The defendant's expert witness Hoerner did a title search of all properties abutting the Pel Daniels road. She found that the deeds of each of those properties, including that of the plaintiffs, referred at least once to the Pel Daniels road as the "old" or "discontinued" road. As she and Fentner both opined, that terminology, although not conclusive, is suggestive of a road that has been discontinued or abandoned.
5. The court accepts the Town's expert's conclusion that the Town would not have intended to continue to maintain a public road on Pel Daniels road any farther north than necessary to serve the homes of Hartland residents. The basis for her conclusion adds particular credibility to that conclusion. Hoerner testified that, based on her reading of a history of Hartland, the Town of Hartland suffered a significant loss of population in the first half of the nineteenth century, declining by approximately one-third between 1800 and 1860 because of emigration to Ohio, and then probably lost additional population from the 50 men sent to fight in the Civil War. She concluded that with the loss of population "they needed to discontinue some of the roads so that their — the maintenance of those roads could be kept to a minimum" (T, 9/8, p. 49), presumably because of a reduced tax base, a diminished financial capacity on the Town's part to carry its duties such as road maintenance, and, perhaps, the need to maintain fewer roads since many houses were no longer occupied.[6] (Testimony of Catherine Hoerner, 9/8, p. 47-49.) The historical treatise itself was not introduced into evidence, and the court allowed her testimony about the Hartland history not for the substantive truth but to explain her conclusions.[7] (9/8, p. 48) The historical evidence of the abandoned homesteads and roads on the Tiffany-Gaines index map, the Ransom sketch, and discussed in the CT Page 6456Gaines Notes, all of which are in the record, however, and which the court may consider for substantive purposes, demonstrate the soundness of the expert's conclusion that the Town would not have wanted to maintain a stub of road that was not necessary to provide access for a resident. Hence, the court finds that the Town would not have maintained the road past the Banning homestead.
6. One important legal doctrine would have concerned the town voters and selectmen in discontinuing roads in 1870. Under the law then, and now, if by discontinuing a road a town cut off access of a resident to a public road, the town would be liable to damages to that resident.[8]
Thus the Town of Hartland would not have intended to discontinue the road so as to deprive Richmond Banning, or anyone else on the Pel Daniels road, of access to a public road. All the other existing homesteads along Pel Daniels road had access to a public road by other means. (Testimony of Catherine Hoerner, T, 9/8, pp. 53-54, 88-90.) There is approximately 1,500 feet between the location of the former Banning homestead (now the Barrett house) and the northern boundary of the Banning/plaintiffs' property. The plaintiffs offered no credible evidence why the Town would have wanted to maintain a road on that additional 1,500 feet past no property needing such access.
7. The evidence at trial was that the Town of Hartland, since at least 1911 (per the Tiffany-Gaines map) has maintained as public highway a portion of Pel Daniels road up to (and, in recent years, slightly farther than) the Banning/Barrett homestead, for a present length of .23 miles from Old Town Road. There are no deeds or other documentary evidence that the Town has ever taken any action, since the original acceptance of Pel Daniels Road in 1731, to accept this .23 miles as a town road. Furthermore, the Gaines Notes do not refer to any active homestead, with people still living there, as located on or near a discontinued road. The evidence establishes that the road north of that .23 miles is unpaved; it abuts state forest to the west of the plaintiffs' property north of the Barrett homestead, and north of the plaintiffs' property the state forest abuts the road on both east and west sides. While there is some indication that the state forest road may be graded annually, and that there are some stone culverts under portions of the road between the Banning/Barrett home and the northern edge of the plaintiffs' property, there was no evidence as to who has done those actions. The state does conduct lumber operations in the state forest, and it is reasonable and likely that the grading is done by the state to facilitate the access of state workers into the state forest. The evidence also established that hunters, joggers, dog walkers, horseback riders, and an occasional vehicle will venture down the unpaved road. But no party introduced any evidence or offered the court any legal authority that an unpaved roadway CT Page 6457 into a state forest onto which members of the public occasionally traverse is by necessity a public roadway.
The chief argument advanced by the plaintiffs to support their claim that the discontinuance ended the northern tip of the Banning property is that the position taken by the Town is inconsistent with two legal principles that the Town would have been aware of in 1870. First, the plaintiffs argue that adopting the position advanced by the defendants' expert that the southern terminus was at the most southern boundary of the Banning/plaintiffs' property would mean that the Town had cut off Banning's access to a public road. (Although the defendants' expert believes Banning may have owned property farther south down Pel Daniels road, all the way to the Old Town Road — and if so, that would have meant that Banning did have access to a public road, she could not testify with any definitiveness on this belief; in view of that lack of certitude or evidence to confirm this theory, the court does not give it any credit.[9]) Second, relying on the doctrine that the termini of a discontinued road must be stated clearly and definitively and the testimony of its expert Zizka that the discontinuance terminology "from" describes an abutting property, the plaintiffs argue that the only clear and definitive terminus consistent with language of abutment would be to construe the southern terminus of the discontinued road as the northern end of the plaintiffs' property.
This court, finds, however, as also advanced by the Town and its expert, that the southern end of the discontinued road was at the Banning homestead. That location means that neither he nor any other property owner on the road was cut off from access to a public road. This view is equally as consistent with language of abutment as that advocated by the plaintiffs. And it also has the virtue, unlike the plaintiffs' position, of being consistent with the other historical evidence.
It is difficult today, 130 years after the Town of Hartland discontinued Pel Daniels road, to know exactly what the town meeting voters and Board of Selectmen meant. Subtle changes in the use of language over time can be very significant in interpreting the meaning of words used in an earlier day. In revising her initial opinion to include the possibility that the discontinuance ended at the Banning homestead, for example, the defendant's expert stated that the discontinuance could have ended there if the various references to other individuals in the discontinuance language were meant to indicate their homesteads rather than their entire tract of property. The difficulty experienced by the plaintiffs' experts in parsing the discontinuance language arises in part from the age of the language they sought to interpret. Most of their experience has come from analyzing deeds of the 20th century, not the 19th. They have acquired their knowledge of the customs and terminology CT Page 6458 of property and road descriptions from the century after the discontinuance. On the edge of a new century, we cannot know the answer for sure, from their language alone, what the discontinuers meant 130 years ago.
Our difficulty in knowing what that language meant, however, does not mean that it was unclear or ambiguous to people 130 years ago. The unambiguous historical evidence of the Gaines Notes, the Tiffany-Gaines index map, the Ransom drawing, the 1869 Hartford Atlas map, the 1870 Hartland Business Directory Map, the town's continued maintenance of the southern portions of the road, the lack of use of the unpaved portions, the long time between the act of discontinuance and any challenge to it all show that the people of Hartland, and any others with interest in properties abutting the discontinued road, knew what portion had been discontinued.
The plaintiffs cite to and rely on various cases holding that for a discontinuance to be valid, its terminal points must be clear so that property owners may know their rights. "Their action, and the action of the town approving it, therefore, should be formal and definite, so as to give parties who may be aggrieved an opportunity to apply to the court for the relief which is provided by statute." Greist v. Amrhyn,80 Conn. 280, 288, 68 A. 521 (1907). While the language of the resolution may be ambiguous to us today, the historical evidence, which would have been known to and understood by those voting on the discontinuance and their neighbors, is not. The plaintiffs' property has changed hands numerous times since the discontinuance. There is no evidence that any of the previous property owners ever challenged the discontinuance for lack of clarity; though not conclusive, that fact suggests either approval or at least knowledge of what the Town did. Unnecessary roads would also add to their tax burden, even if abutting their property. Based on all the evidence offered, the court finds that "from Richmond Banning's north" meant, to all concerned, "from his house."
The parties have cited no case directly on point to the present situation, where extrinsic evidence establishes that the description of a discontinued road was perfectly clear to those who enacted it and whom it affected. Although the plaintiffs cite authority that the termini of a discontinuance are its most important characteristics; Clark v.Middlebury, 47 Conn. 331, 335 (1879); New London v. New York, N.H.H.R.Co., 85 Conn. 595, 602 84 A. 114 (1912); and must be stated clearly, they have not cited any instance in which a court held a discontinuance to be invalid because of ambiguously stated termini. The cases cited by the plaintiffs show courts seeking to ascertain the termini, which they have sometimes determined by specific measures contained in the resolution;Blakeslee v. Tyler, 55 Conn. 387 (1887); or by other internal reference CT Page 6459 within the discontinuance language. Brownell v. Palmer, 22 Conn. 108
(1852). But the court is not aware of any case invalidating a discontinuance which readers 130 years later find ambiguous but which a review of extrinsic evidence establishes to have been understood by its contemporaries and their descendants for the next 120 years as clear.
Furthermore, this court believes that this same historical evidence amply supports a finding that the road was abandoned, if not effectively discontinued. The public character of the act to discontinue the road, the long term of disuse (the limited use of the unpaved road does not convert it to a public road), the historical data (especially, but not limited to, the Tiffany-Gaines map of 1911 and the Ransom sketch of 1954 showing the road to be discontinued), the town's conduct of maintaining the road for only .23 miles, the 120-year delay in any challenge to abandonment all demonstrate that this road has been abandoned as a public road for long enough to be abandoned if not effectively discontinued.
For a court to find abandonment of a road, "[m]ere nonuse is not enough. The case law requires an intent to abandon together with the nonuse." Marrin v. Spearow, 35 Conn. App. 398, 405, 646 A.2d 254 (1994). "The length of time during which such nonuser must continue on the part of the public, before the highway can be presumed to be abandoned, has not been determined in this State by statute or judicial decision. It must be a long time." Greist v. Amrhyn, supra, 80 Conn. 285. "The desertion of a public road for nearly a century, is strong presumptive evidence that the right of way has been extinguished.' Beardslee v.French, 7 Conn. 125, 128 (1828)." Newkirk v. Sherwood, 89 Conn. 598, 604,94 A. 982 (1915). Here the evidence and historical data all evince with certainty that the Town in 1870 intended to relinquish its rights over the roadway from the point of the Richmond Banning homestead north.
The plaintiffs argue that the town's omission of abandonment as a special defense forfeits its right to assert this claim now. The court disagrees. The plaintiffs' complaint undertakes the positive burden of alleging that the action of the Board of Selectmen in October 1870 "to discontinue certain roads as public roads . . . did not include Pell Road." (Plaintiffs' Complaint, paragraph 25a); and that "neither Pell Road nor any portions of Pell Road have ever been discontinued as public roads." (Paragraph 25b.) Its claim for relief seeks a "declaratory judgment that Pell Road is a public road within the meaning of the Defendant Town and Commission's subdivision regulations." Those regulations require that roads in a subdivision must either have been dedicated and accepted for public travel by the Town or State or, at the developer's expense, constructed as a private street in accordance with town standards. (Plaintiffs' Exhibit R, "Requirements for the Approval of Subdivision Plans in the Town of Hartland, Connecticut, as amended" and CT Page 6460 Plaintiffs' Exhibit AA, "Minimum Standards for Roads in Hartland, Connecticut") As the plaintiffs have pleaded the road to be public and sought such a declaratory judgment, it was their burden to sustain this burden of proof. They have failed to do so.
The court's findings here thus also defeat the plaintiffs' other claim, that even if the road were properly discontinued or abandoned, public use since 1870 would, pursuant to the doctrine of dominion and control, convert the road to a public road by implied dedication and acceptance.[10] To find an implied dedication, "two elements are essential to a valid dedication: (1) a manifested intent by the owner to dedicate the land involved for the use of the public; and (2) an acceptance by the proper authorities or by the general public. No particular formality is required in order to dedicate a parcel of land to a public use; dedication may be express or implied. Whether there has been a dedication and whether there has been an acceptance present questions of fact."Meshberg v. Bridgeport City Trust Co., 180 Conn. 274, 279, 429 A.2d 865
(1980). The evidence does not establish either requirement to have been proven. In the present case, the plaintiffs offered no evidence that owners of land abutting the discontinued or abandoned Pel Daniels road intended to "dedicate their road to public use." Nor is there any evidence that the defendant Town has ever formally accepted the road again; in fact, all the evidence is to the contrary. Although there is some testimony that people occasionally walk, bicycle, drive, jog, run, or horseback ride over the discontinued portions of the road,
 [a]cquiescence of the property owners to its use by some members of the public does not conclusively establish its dedication to the borough for public use. Mere permission on the part of the owner to the public to use the land as a way, without more, will not constitute an intention to dedicate, since a temporary right to use a private way is in the nature of a mere license, revocable at pleasure, and does not in any sense establish the requisite intent. Accordingly, mere permissive use of land as a street or the like, where the user is consistent with the assertion of ownership by the alleged dedicator, does not of itself constitute a dedication nor demonstrate a dedicatory intention.
(Internal quotations and citations omitted.) Mihalczo v. Woodmont,175 Conn. 535, 542, 400 A.2d 270 (1978).
Here, just as in Meshberg, without any evidence that the defendants formally accepted the disputed portion of Pel Daniels Road after 1870, CT Page 6461 "the question presented by this appeal is whether the facts found support the conclusion that the town had by its conduct accepted that portion. . . ." Meshberg v. Bridgeport City Trust Co., supra, 180 Conn. 279. There is no such evidence of any maintenance of action whatsoever by the Town of the portion north of the .23 mile now maintained by the Town and which it admits to be a public road, whether of grading, snow plowing, maintenance, etc. One witness even testified that the Town pushes all the snow it ploughs from the .23 miles it does maintain into a big pile at the end of the paved and maintained road, blocking access in the winter to the remainder of the road.
"Without a dedication, there can, of course, be no acceptance."Mihalczo v. Woodmont, supra, 175 Conn. 543. However, the evidence here also falls short of the requisites for proving implied acceptance.[11]
State emergency personnel responding to forest fires in the state forest, the state inviting loggers into the forest to haul away trees, or the limited use by random members of the public described above and by witnesses at trial do not rise to the level of public use as to transfer the road discontinued or abandoned 130 years ago into a public roadway once again.
The plaintiffs' final claim is based on a town meeting called by town officials at the request of Adrien French[12] in 1996; T, 8/31, p. 31; for the purpose of "verifying the discontinuance of the unimproved portion of Pell Road as a Town Road and to abandon any ownership or interest by the Town in the unimproved portion of Pell Road to the abutting property owners." (Plaintiffs' Exhibit U). On January 16, 1996, the Board of Selectmen then published a Notice of Special Meeting on these matters:
 "1. To consider and act upon the official discontinuance as a Town Road of the unimproved (unpaved) portion of Pell Road, East Hartland. 2. To consider and act upon the surrender by the Town of East Hartland of any interest in ownership in the unimproved (unpaved) portion of Pell Road to the abutting property owners of said portion."[13]
(Plaintiffs' Exhibit T). At that special meeting town members voted to abandon the first item "as being redundant and unnecessary as the road had already been discontinued by Town Meeting vote in 1870" and defeated the resolution pertaining to the second item. (Plaintiffs' Exhibit V.)
The Town thus took no action to discontinue or abandon the road in 1996. Was the mere calling of the 1996 meeting some kind of admission on the part of the Town that its previous votes 126 years earlier were CT Page 6462 ineffective? Not under the circumstances here. This meeting was called as a favor for a resident who "claimed he was having a problem demonstrating ownership of the road and that was causing him a problem as far as selling the property" (Testimony of Town First Selectman William Hodge, 8/31, p. 31). Such a purpose is inconsistent with showing, to the contrary, that the road is still a town public road.
Accordingly, the court must decline to issue the declaratory judgment sought by the plaintiffs that the unimproved and unpaved portion Pel Daniels Road abutting their property and north of the .23 mile segment still maintained as a public thoroughfare is a public road of the Town of Hartland or State of Connecticut. Moreover, the plaintiffs have presented no evidence or legal claims in support of their second request for declaratory relief other than their request for a declaratory judgment that Pel Daniels Road is a public road.[14] The court having found that the plaintiffs did not sustain their burden of proof as to the claim of the road still being a public road, both the first and second claims for relief must fail.
Therefore, the court enters judgment for the defendants.
SO ORDERED.
BY THE COURT
Frazzini, J.