### LINDGREN v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. October 20, 1919.)

No. 3210.

1. EMBEZZLEMENT ⊙�ネ5, 47—FELONIOUS INTENT AS ELEMENT.
    A felonious intent is an essential ingredient of the crime of embezzlement by a bailee, and such intent is always a question for the jury.

2. EMBEZZLEMENT ⊙⟹39—EVIDENCE OF INTENT.
    The exclusion of testimony offered by a defendant, charged with embezzlement as a bailee, tending to show absence of a felonious intent, *held* error.

    Gilbert, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Fourth Division of the District of Alaska; Charles E. Bunnell, Judge.

Criminal prosecution by the United States against John Lindgren. Judgment of conviction, and defendant brings error. Reversed.

⊙⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Cecil H. Clegg and Le Roy Tozier, both of Fairbanks, Alaska, and Fernand De Journel, of San Francisco, Cal. (De Journel & De Journel, of San Francisco, Cal., of counsel), for plaintiff in error.

R. F. Roth, U. S. Atty., of Fairbanks, Alaska, and Annette Abbott Adams, Asst. U. S. Atty., of San Francisco, Cal.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge. It appears from the record that prior to November 20, 1916, one Henry Cook held a lease from the owners of certain mining ground situated on Vault creek, in the Fairbanks recording district of Alaska, during the operation of which he became indebted to various parties in various amounts; among his numerous creditors being the plaintiff in error, Lindgren, in the sum of $6,650, Samson Hardware Company in the sum of $6,848.03, and E. R. Peoples, Incorporated, in the sum of $4,383.02. In that condition of affairs, Cook assigned, in writing, his lease of the property, called Sierra association claim, together with the machinery thereon, to a man named E. M. Keyes, "to have, use, and hold the same in his mining operations under said lease and the present assignment · thereof"—the lease expressly declaring:

"And in consideration thereof the said E. M. Keyes agrees to carry on mining operations upon said demised premises under said lease in a miner like manner; that out of the gross proceeds of such mining operations he will first pay the royalty which shall accrue thereon under said lease, to the owners of said demised premises, excepting the said Henry Cook, and will next pay his actual operating expenses, which shall include wages of himself at the rate of $10 per day while actually engaged in said mining operations, all laborers' wages, cost of material, wood, and other supplies furnished, necessary repairs to and replacement of worn-out tools and equipment, and will pay or cause to be paid the part of said output then remaining pro rata to the following creditors of the said Henry Cook in proportion to their respective claims, as set forth in the instrument signed by them and hereto attached and made part hereof."

That instrument, which was signed by the creditors of the said Cook, including those that have been mentioned, declared as follows:

"In consideration of the foregoing assignment of lease, lease of mining machinery, and agreement on the part of the said E. M. Keyes to carry on mining operations upon the land in said lease so assigned and referred to, we, the undersigned creditors of the said Henry Cook, in the amounts set opposite our respective names, do hereby agree that we will not, prior to August 1, 1917, commence or prosecute any action against the said Henry Cook, nor attach nor issue execution against any of the property hereinbefore leased to the said E. M. Keyes, nor attempt in any wise, by proceedings at law or otherwise, to interfere with or hinder the said E. M. Keyes in his mining operations upon said ground, nor with his use of the machinery thereon and used by him, and will accept as payment on account of our respective claims against the said Henry Cook, out of the net proceeds of said mining operations as above provided, our pro rata share thereof in proportion to our respective claims"— which were enumerated.

While Keyes, who was engaged in mining other property in the vicinity, does not appear to have signed the lease reciting his foregoing agreement, the record shows that he entered upon the performance thereof, putting in active charge of the work a foreman named

Anderson, who had been foreman for Cook while he was working the property prior to the assignment. It appears that the money due Lindgren was for wood furnished by him for the working of the ground, a part of which wood was furnished to Cook before his assignment of the lease, and a part of it to Keyes after the assignment, and that the amounts due, respectively, E. R. Peoples, Incorporated (of which concern one Stroecker was bookkeeper), and Samson Hardware Company (whose representative was one Barrack), were for other supplies furnished in the mining operations.

Keyes took possession of the mine shortly after the assignment of the lease to him, and on the 22d of May, 1917, there was a clean-up of the dump, which yielded about $7,000 in gold dust—a man named Webster representing Keyes, and Stroecker being also present as the representative of E. R. Peoples, Incorporated. It appears that it was agreed among all the interested parties present that the proceeds of the clean-up should be sent by Lindgren to Fairbanks, and there converted into money, which money should be brought back to the mine by Lindgren, where it should be distributed in payment, so far as it would go, of the amounts due the laborers, and that this was done. But it also appears that the money so realized was not sufficient to entirely pay the amounts due the laborers, and there was testimony given on the trial tending to show that the latter were unwilling to proceed with the work upon the mine, except upon the agreement that the remaining indebtedness to them, as well as what they should earn by future work, should be paid out of the next clean-up.

Whether or not that arrangement was fully agreed to by all of the interested parties present—there was a substantial conflict in the testimony upon the subject—the work did proceed as before under Keyes, and a second clean-up was made, which amounted, after paying the royalty due the owners of the property, to $5,479.55, which amount was not sufficient to pay in full the claims of the laborers. It appears that the gold dust from the second clean-up was also sent in charge of Lindgren, on a Saturday, to the bank at Fairbanks, distant from the mine about 27 or 28 miles, for conversion into money, he arriving there too late in the evening to return to the mine that night, but he got the $5,479.55 in money, and the next day—Sunday—he started back with it to the mine, but before proceeding far changed his mind and concluded not to go, of which change and intention he notified Stroecker (who was at the mine) over the telephone, resulting in the arrest that (Sunday) night of the plaintiff in error at the instance of Stroecker, acting for and by direction of E. R. Peoples, Incorporated, and his subsequent indictment, trial, and conviction in the court below; the indictment being in these words:

"That the said John Lindgren, on the 2d day of June, 1917, in the Fairbanks precinct, Fourth judicial division, territory of Alaska, had in his possession a certain sum of money of the value of five thousand and four hundred and seventy-nine and 55/100 dollars ($5,479.55) lawful money of the United States, a further description whereof is to the grand jury unknown, which said sum of money was then and there the property of E. M. Keyes, as trustee for certain laboring men other than the defendant, which had been

delivered into and intrusted to the possession and control of the said John Lindgren, as bailee of the said E. M. Keyes, as trustee for certain laboring men other than the defendant, and the said John Lindgren accepted and received the same as the property of the said E. M. Keyes, as trustee for certain laboring men other than the defendant, and as bailee of said E. M. Keyes, as trustee for certain laboring men other than the defendant; that at the aforesaid time and place said John Lindgren, contrary to the terms of his said trust and holding the aforesaid sum of money as such bailee, did then and there willfully, unlawfully, and feloniously embezzle and fraudulently convert to his own use the aforesaid sum of money, with the unlawful, felonious, and fraudulent intention to then and there deprive the aforesaid E. M. Keyes, as trustee for certain laboring men other than the defendant, thereof—contrary to the form of the statute in such case made and provided and against the peace and dignity of the United States of America."

[1, 2] It is elementary that a felonious intent on the part of the accused was essential to his conviction of the crime alleged. Yet the record shows that on the trial the court, upon objections interposed by the attorney for the government, refused to permit either the defendant or Cook to testify that the defendant, on his way back to the mine with the $5,479.55, met Cook, when this, in substance, occurred between the two: That in answer to a question by Cook as to how things were going at the mine, the defendant said, not very well. When Cook further asked the defendant whether he had received the amount due him, and being answered in the negative, Cook said to the defendant:

"Well, you keep that money"—referring to the proceeds of the second clean-up, which the defendant was at the time taking back to the mine—adding: "That money belongs to me, always did, and you have a right to apply it on your account."

To the refusal of the court to permit that testimony, either by Cook or the defendant, the latter duly reserved exceptions, as well as to the subsequent refusal of the court to permit the defendant to answer this question:

"Q. Did you act upon the advice of any attorney in holding the gold dust as you have testified you did hold it, on Sunday, the 2d day of June, 1917?"

By the question so propounded the defendant was, in effect, asked whether in withholding the money under the circumstances testified to by him, he acted upon the advice of an attorney. In each of the rulings mentioned we are of the opinion that the court below committed clear error. It was not at all a question as to whether the defendant had the legal right to withhold the money in payment, or to secure the payment, of the amount due him for the wood he had furnished; but the question for the jury to determine was whether he withheld the $5,479.55 with the felonious intent to embezzle it. It was not and is not pretended that there was any secrecy about the defendant's conduct in the matter; according to the evidence, he talked at least twice over the telephone with Stroecker, first telling him that he was going to the mine with the money, and later informing him that he (defendant) had changed his mind. If, in doing so, the defendant acted in good faith, believing that he had the legal right to withhold the money and with no felonious intent respecting it, it

is manifest that he could not be guilty of the crime of embezzling the money. Surely, therefore, the defendant was entitled to have the jury informed as to what if any advice he received from his attorney; and equally clear is it, we think, that he was entitled to have the jury consider the conversation he had with Cook that has been referred to, particularly as it appeared from the testimony that his arrest and prosecution was had at the instance of E. R. Peoples, Incorporated, and that in the testimony of Peoples there was a very evasive denial, if denial at all, of this testimony of the defendant:

"Q. Did you have a talk with Peoples there (referring to a time preceding any work by the assignee of the mining ground)? A. I did. Q. What was said to you about hauling any wood or anything else onto this Sierra association? A. Mr. Peoples stated that there was some arrangement made whereby Mr. Cook could go ahead with his mining operations on Vault creek, and Peoples asked me if I would go ahead and furnish wood for the claim during the winter of 1917 and the early part of the winter of 1916, and I asked him who was going to operate the ground and he told me he—Mr. Peoples and Mr. Barrack—was to finance Henry Cook, so that he could go ahead with his operations on Vault creek, and I asked then Mr. Peoples how much wood he thought they would need there, and he told me about 300 cords; they figured taking out a block there. I also asked Peoples if he had been out and panned the ground, and if he knew that the ground would pay. * * * Q. What was said between you and Peoples there with reference to you furnishing any further wood or timbers upon this claim? * * * A. I told Mr. Peoples that I did not feel financially able to furnish the wood to the claim without knowing that I would receive the money therefor. Mr. Peoples took a piece of paper and a pencil, and he figured out that the dead work was done on the claim. He showed me where the dump box and the sluice boxes had been put in, and that the shaft was down and partly cribbed. He also showed me that the machinery was all set up. And he said: 'In fact, they are about ready to hoist the dirt.' He also figured out what the wood would cost. He asked me what I would charge for the wood, and I told him, and he figured out what the expense of the men would be, and he figured out that it would produce about $1.50 to the square foot. He told me whatever I put on the ground, or done, or furnished to the claim, during the winter of 1916 and 1917 would be absolutely good, that there was no chance to lose on it, and that he (Peoples) would see that I was paid in the spring out of the clean-up, or, if the clean-up didn't produce enough gold out of it, that he (Peoples) would pay me. Q. Did you afterwards go out onto the property and haul wood? A. I did."

The section of the Criminal Code of Alaska (Comp. Laws, § 1927, p. 657), upon which the indictment in the present case was based, was copied from a similar section of the Code of Oregon, and in the case of State v. Littschke, 27 Or. 189, 40 Pac. 167, it appeared that Littschke received, as bailee, from one Mrs. Hess, certain money which one Liebe thereafter claimed that Mrs. Hess had stolen from him and which he thereafter demanded from Littschke, notifying him that should he make any other disposition of the money he would be held responsible. By indictment in that case it was charged that Littschke, while so in possession, embezzled and feloniously converted the money to his own use. A conviction having been had, the Supreme Court, in reversing the judgment and remanding the case for a new trial, said, among other things:

"The other assignment of error is directed to the refusal of the trial court to permit the defendant to show that the money which he is accused of embezzling did not belong to Elizabeth Hess, but had been stolen by her

from one Theodore Liebe; that Liebe had demanded of him the possession thereof, and ordered and directed him not to pay it over to Mrs. Hess, and at the same time notified him that, if he did, he would be held responsible therefor."

After referring to the rule in relation to bailments, the court further said:

"But, notwithstanding this rule, the evidence was clearly competent on the question as to whether the money was in fact feloniously converted by the defendant to his own use with an intent to steal it. A felonious intent is an essential ingredient of the crime charged in the indictment, and is always a question for the jury. Without a felonious and criminal intent on the part of the defendant, there could have been no crime, although there may have been a breach of trust, and although Liebe's claim to the money may constitute no defense in a civil action by Mrs. Hess to recover possession, because of the rule that a bailee cannot dispute the title of his bailor. But this is a criminal prosecution, and the conversion by the defendant must not only have been a tortious act, but it must have been with a felonious intention, and this, as we have already said, was a question of fact for the jury under all the circumstances of the case. If he was the bailee of Mrs. Hess, and in good faith retained possession of the money, and refused to pay it over to her because of Liebe's claim and demand, but with no intention of converting it to his own use, he cannot be convicted of the crime charged in the indictment, because in such case there would be an entire absence of the felonious or criminal intent which is an essential ingredient of the crime."

On principle, the present case is stronger for the appellant than was the case cited, for there the appellant had no apparent interest in the money, while here the appellant had at least some direct interest in the proceeds of the clean-up. It seems unnecessary to multiply authorities to the effect that in such cases a felonious intent is essential to constitute the crime of embezzlement. We cite, however, a few. State v. Coyle, 41 Utah, 320, 126 Pac. 305; People v. Lapique, 120 Cal. 25, 52 Pac. 40; Wadley v. Commonwealth, 98 Va. 803, 35 S. E. 452; Dunavant v. Commonwealth, 144 Ky. 210, 137 S. W. 1051; Walker v. State, 117 Ala. 42, 23 South. 149; Eatman v. State, 48 Fla. 21, 37 South. 576; 15 Cyc. 508.

The judgment is reversed, and the case remanded for a new trial.

HUNT, Circuit Judge. I concur in the judgment of reversal and remand for new trial, upon the ground that the court erred in refusing to permit the defendant to testify to the conversation he had with Cook. The matter appears to have been so directly connected with the transaction involved, and with the act of the defendant in retaining the money intrusted to him, that the defendant should have been given the right to introduce the evidence before the jury, as bearing upon the ultimate question of whether or not his conduct was actuated by fraudulent or honest purpose.

GILBERT, Circuit Judge (dissenting). I cannot agree to the proposition that it is competent evidence for the defense, on a trial for larceny by bailee, to show that the accused was told, by one who had no interest in the money which he held in trust, to keep the money and appropriate it to his own use. The money which the plaintiff in error had in his possession did not, as he was well aware, belong to

Cook. Both Cook and he were parties to a written agreement by which Cook assigned his lease to Keyes, and whereby the latter was obligated to pay all sums realized upon clean-ups pro rata to Cook's creditors. In pursuance of that agreement the plaintiff in error had been intrusted with the proceeds of the first clean-up, and had taken it to Fairbanks, and had returned with the money for the payment of creditors pro rata in pursuance of the agreement. He was intrusted in the same manner with the proceeds of the second clean-up. He was well aware of the terms of the agreement, and of the understanding under which the mine was operated. It is true that one who appropriates money under authority of another, under the bona fide belief that he is authorized, is not guilty of larceny, although his belief is mistaken.

"It is necessary, however, in all cases, that the claim of right be a bona fide one." 25 Cyc. 50.

It is not shown, and there was no offer of proof, that the plaintiff in error was influenced in any degree by Cook's statements; on the contrary, his whole evidence is that he never at any time appropriated, or intended to appropriate, or keep the money. He testified that after his conversation with Cook he continued on his way to the mine, and that he returned to Fairbanks only on account of the lameness of his horse, that he intended to go out with the money on the train on the following morning, and that he would have done so, but for his arrest.

I agree with Judge HUNT that it was not reversible error to sustain the objection to the question propounded to the plaintiff in error:

"Q. Did you act upon the advice of any attorney in holding the gold dust, as you have testified you did hold it, on Sunday, the 2d day of June, 1917?"

The plaintiff in error had testified that he held the gold dust on Sunday, the 2d day of June, in trust for the true owners thereof, and that he intended to take the same to the mine, there to be disbursed in accordance with the agreement of the parties. It was immaterial whether or not, in so holding it, he was acting under the advice of an attorney.