## MORISSETTE v. UNITED STATES.

### No. 10974.

United States Court of Appeals
Sixth Circuit.

Feb. 5, 1951.

McAllister, Circuit Judge, dissented.

Andrew J. Transue, Flint, Mich., Andrew J. Transue, Flint, Mich., on brief, for appellant.

Janet E. Kinnane, Bay City, Mich., Edward T. Kane, Detroit, Mich., Janet E. Kinnane, Bay City, Mich., on brief, for appellee.

428

Before ALLEN, MARTIN and McALLISTER, Circuit Judges.

MARTIN, Circuit Judge.

On this appeal from a judgment of commitment and sentence, the only significant issue is whether the district court erred in its interpretation of Title 18, section 641, United States Code Annotated, which provides: "Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; * * * Shall be fined not more than $10,000 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both."

The appellant contends that, in order to constitute a crime, there must have been a felonious intent in his mind at the time he converted to his own use property of the United States located on premises leased by it. This argument was rejected, the district judge taking the practical and correct view that the statute means what it says and is violated when a person "knowingly converts to his use" government property. The facts of record cannot reasonably be controverted that the appellant knew what he was doing, namely converting to his own use property of the United States when he took and carried it away and subsequently sold it for his own benefit. In effect, he merely denies that he had an evil or felonious intent.

The further insistence is made that if appellant believed that the government had abandoned the property taken by him, he should not have been found guilty, though mistaken in his belief. The district judge charged the jury that there was no evidence of abandonment of the property by the United States, and that appellant's claim that the property had been abandoned constituted no defense in the circumstances.

The uncontroverted proof shows that appellant took from property leased by the government some three tons of used bomb casings, owned by the government, and sold them for approximately $84.

Briefly reviewed, the salient facts are that appellant, a junk dealer who also operated a fruit stand in the summertime, went on a deer hunt with his brother-in-law. They entered upon Oscoda Air Base which was leased by the United States from the Conservation Department and the Department of Agriculture of the State of Michigan. This military reservation was used as a practice bombing range and was in such use on the day of the trial.

In a statement voluntarily made to the Federal Bureau of Investigation, appellant related that he and his hunting companion did not get any deer, so they decided to make their hunting trip pay by loading up his two-ton truck with used bomb casings. Without permission of the Commanding Officer of the air base, or without permission of anyone representing the United States, appellant took and carried away from the government reservation, in two truck loads, some three tons of used bomb casings undeniably property of the United States. The used bomb casings were piled on the edge of a cleared-out range and were each about three and one-half feet long, eight inches in diameter, and when empty weighed around sixteen pounds. The Captain commanding Oscoda Air Base testified that he had never had authority to dispose of used bomb casings, and that appellant at no time had asked his permission to take any of them. Morissette admitted that he had received no permission to pick up the bomb casings and knew that they did not belong to him. After taking the used bomb casings to a nearby farm and crushing them, appellant loaded his loot into his truck. He carried the bomb casings to Flint, Michigan, and sold them there to a coal and iron company. He testified that the bomb casings were rusted and that he thought they had been abandoned. He emphasized that he took them in broad daylight and made no effort at concealment. After considerable hedging, he finally admitted under questioning

by the judge that he knew the bomb casings were on government property when he took them.

The statute which appellant violated, Title 18, sec. 641, United States Code Annotated, condemns not only the embezzlement, stealing and purloining of government property, but also the knowing conversion by a person to his own use, or to the use of another, of anything of value belonging to the United States, or the sale or disposition without authority of any government property. The conversion to his use and the selling of the bomb casings without authority were, as appears from the record, knowingly done by the appellant.

Appellant's attorney urges that both the indictment and the statute require proof of felonious intent. We are unable to accept this interpretation as valid. As to the indictment, the federal courts long ago abandoned the course of reversing convictions for crime on the technical niceties of pleading. An indictment is sufficient which fairly apprises the defendant of the charge which he is to meet and enables him to prepare his defenses and, after trial, to stand against double jeopardy upon a plea of former acquittal or former conviction. This court has frequently stated the principle. Dowling Bros. Distilling Co. et al. v. United States, 6 Cir., 153 F.2d 353, certiorari denied 328 U.S. 848, 66 S.Ct. 1120, 90 L.Ed. 1622, rehearing denied 329 U.S. 820, 67 S.Ct. 29, 91 L.Ed. 698; Bogy v. United States, 6 Cir., 96 F.2d 734 (and cases there cited), certiorari denied 305 U.S. 608, 59 S.Ct. 68, 83 L.Ed. 387; Blum v. United States, 6 Cir., 46 F.2d 850. Authorities from other circuits are overwhelmingly to the same effect. See cases digested in 34 Federal Digest, Indictment and Information ⊜71. See also Rule 7(c), Rules of Criminal Procedure, 1950 Revised Edition, 18 U.S.C.A., wherein, after prescribing the essential contents of a valid indictment, it is provided: "The indictment or information shall state for each count the official or customary citation of the statute, rule, regulation or other provision of law which the defendant is alleged therein to have violated. Error in the citation or its omission shall not be ground for dismissal of the indictment or information or for reversal of a conviction if the error or omission did not mislead the defendant to his prejudice." The indictment in this case fully meets the test. Morissette was sufficiently apprised of the charge against him and could never again be convicted for taking the used bomb casings here involved and selling them as he did.

The statute in question, section 641 which consolidates sections 82, 87, 100 and 101 of Title 18 United States Code, 1940 Edition, is not limited in coverage to embezzling, stealing and purloining government property, but also blankets the knowing conversion of such property by anyone to his own use. It is not at all unusual in federal statutes to find that Congress has, in a single paragraph, defined separate and distinct crimes involving different elements.

Manifestly, the purpose of Congress in enacting section 641 was to afford added protection against the taking of government property. The word "or" as used in the statute evinces that purpose. If it had been intended to require knowing conversion to fall within the same category with embezzlement, stealing and purloining, the word "and" would have been used in the statute. Furthermore, the phrase "knowingly converts to his use or the use of another" would be surplusage if placed in the same category with embezzlement, stealing and purloining.

Though we had independently reached our conclusion as to the correct construction of section 641 before research brought to our attention Adolfson v. United States, 9 Cir., 159 F.2d 883, 885, we find that case supports our own interpretation. There, the Court of Appeals for the Ninth Circuit was required to construe section 87 of Title 18 United States Code, which was one of the statutes consolidated into section 641 of Title 18. See Title 18, U.S.Code Congressional Service, 80th Cong., 2d Sess., page 2505. The Court of Appeals in the Adolfson case stated that the insistence of Adolfson was that section 87 is purely an embezzlement statute; that the indictment

charged embezzlement and nothing more; and that to "apply the property of another to one's own use is to embezzle". The contention was thus rejected: "The simple language of section 87 refutes that argument for it covers several specifically named offenses wholly apart and divorced from the technical offense of embezzlement. One of these specifically and separately named offenses is that of knowingly applying to one's own use property 'furnished or to be used for the military or naval service'. The prohibition against knowingly applying Government property appears in the text of section 87 after the word 'or' which follows the reference to the offense of embezzlement. The use of the word 'or' clearly indicates alternative circumstances (cf. Barkdoll v. United States, 9 Cir., 147 F.2d 617, 618) and was obviously intended to identify and define a wholly separate and distinct offense, and we so hold. Appellant would have us read out of section 87 a meaning, a purpose, a definition and a protection of public property which to us clearly appears to speak the plain intent of the lawmakers." 159 F.2d 885, 886.

In passing, it might well be observed that, while the pertinent portion of the statute before us exacts as essential to conviction knowledge by the accused that he is converting property of the United States to his own use, scienter is not even an essential ingredient of all statutory crimes defined by Congress. In United States v. Behrman, 258 U.S. 280, 288, 42 S.Ct. 303, 304, 66 L. Ed. 619, the Supreme Court said: "If the offense be a statutory one, and intent or knowledge is not made an element of it, the indictment need not charge such knowledge or intent." See also United States v. Jackson, C.C., 25 F. 548; United States v. Guthrie, D.C., 171 F. 528, 531. An outstanding authority on the subject of scienter is the opinion of Chief Justice Taft in United States v. Balint, 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604. The Supreme Court there held that, to constitute the offense of selling drugs contrary to the Anti-narcotic Act, 38 Stat. 785, 26 U.S.C.A. § 2554, it is unnecessary that the seller be aware of the character of the drugs; and that punishment for an illegal act done by one in ignorance of

facts making it illegal is not contrary to due process of law. See United States v. Reese, D.C., 27 F.Supp. 833, applying this principle to the Migratory Bird Act, 16 U. S.C.A. § 703 et seq.

Appellant urges that, inasmuch as he believed the bomb casings which he took, carried away and sold had been abandoned by the government, there was presented a question for the jury with appropriate instructions as to what was the condition of Joseph Morissette's mind at the time he took the bomb cases.

■ Abandonment of property, in order to exculpate one taking it, must include both intention to abandon and an act or acts carrying such intention into effect. As was held in Log-Owners' Booming Co. v. Hubbell, 135 Mich. 65, 69, 97 N.W. 157, 4 L.R. A.,N.S. 573 (an action of replevin), both the intention to abandon and actual relinquishment must be shown. It will not excuse one who takes property without permission to state that he was under the impression that the property had been abandoned and that he had a right to take it. In the case before us, the property of the United States taken and converted to his own use by appellant was not without value and had merely been stacked up and left lying on the government military reservation. Appellant made no investigation as to his right to take the property, and neither asked nor received permission to take it. One witness testified that, when he saw the used bomb casings on the truck upon which appellant moved them away, he "wondered why anybody else could get them when we couldn't get them for our scrap drive for the Chamber of Commerce and Agriculture." Captain Askelson, Commanding Officer of the Air Base, testified that he had never been given authority to dispose of the used bomb casings owned by the United States Government; that Morissette at no time asked his permission to take them; and that when he received the report that the government property had been taken he notified the state police and a section of the Criminal Investigation Division of the Army, and asked the state patrol to find out who got the bomb casings and where they were.

Generally speaking, the question of whether property has been abandoned is, of course, for the jury; but here, as the district court held, all the testimony proves that the property had not been abandoned by the government of the United States, and the district judge so instructed. The defense throughout was based upon insistence that, in order to convict there must have been a criminal intent in the defendant's mind. The trial judge had to meet that issue, and we think correctly did so. He could not leave to the jury the interpretation of the federal statute. No proof was adduced by the defendant to the effect that the property had actually been abandoned.

The comments in the charge of the judge show that he believed appellant had no legitimate defense. In our opinion, greater restraint in expression should have been exercised. The court, however, charged the jury as to the burden upon the government to prove its case beyond a reasonable doubt; that the defendant was to be presumed innocent, unless the presumption was overcome by the establishment of his guilt beyond a reasonable doubt; and that the jurors were the judges of the facts of the case and could return a verdict of not guilty.

As we have interpreted the statute, appellant was guilty of its violation beyond a shadow of doubt, as evidenced even by his own admissions. To reverse and remand for a new trial because of the expressions of the district judge in his charge would be to ignore the spirit as well as the letter of Rule 52(a) of the Federal Rules of Criminal Procedure respecting harmless error. That rule provides: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." As was said in Kotteakos v. United States, 328 U.S. 750, 764, 765, 66 S. Ct. 1239, 1248, 90 L.Ed. 1557: "If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress."

The lenient sentence imposed evinced a sound exercise of judicial discretion vested in the district courts in empowering them to make the punishment fit the crime within the limits of the statute violated.

The judgment is affirmed.

McALLISTER, Circuit Judge (dissenting).

Appellant was indicted for unlawfully, wilfully, and knowingly stealing and converting to his own use metal bomb casings from a bombing range of an Army Air Base in Michigan. He was convicted, and appeals, claiming that the district court erred in virtually directing a verdict of guilty against him.

The background of the case is as follows: Joe Morissette, age twenty-seven, an honorably discharged American soldier, lived with his wife and small son in the northeastern part of Michigan, at a small town, Oscoda. To support his family, he worked in fruit markets, hauled scrap iron, and did a little trucking. He owned a small motor truck. In the fall of 1948, he was deer hunting with his brother-in-law and a friend in the bomb base woods in the neighborhood where he had been living. This is a large wooded and waste area owned by the Conservation Department of the State of Michigan, and is located almost in the midst of state and national forests and state game areas, operated as public hunting grounds. It had been leased to the federal government as a base for training Army bombers. Among sportsmen, it was known as good deer country and was used for hunting by many people.

In using the so-called bomb base for training bombers, Army planes dropped practice bombs on a certain portion of the area. These practice bombs are made of a thin casing of metal about 3½ feet long and 8 inches in diameter. Approximately 100 pounds of sand is poured into a casing, and on top of this is placed 3 pounds of black powder. When the casing is dropped to the earth, the black powder is ignited, and the smoke puff shows the location of the strike. After the practice bombs have been used, they are cleared off the range and thrown in piles beyond the target area

"so that they will be out of the way," as the commanding officer of the base expressed it.

In hunting through the area in the fall of 1948, Morissette and his two companions came upon one of these piles of old used bomb casings in the middle of the woods. The casings in question had been cleared off the target area and thrown into piles for approximately four years. They were exposed to the weather and were pretty well rusted out. Some were practically decomposed and others were in the process of decomposition. The pile was located about half a mile from a traveled road and about six miles from the main highway. Morissette testified that he thought the casings had been abandoned and it occurred to him to take a load of them over to the farm where he kept his junk pile of scrap metal purchased from farmers and collected through the countryside. He planned to flatten the casings out so they could be more easily transported. At the time he came upon the pile, he had his truck nearby, and his two companions helped him to load it with the casings. It was broad daylight. Other hunters coming through the woods saw them loading the casings and stopped to talk to them about the prospects of getting deer in the locality. After Morissette got the casings to his junk pile, he flattened them out, reloaded them on his truck with other metal scrap, and drove to Flint, where he sold them for $84.00. Altogether, they weighed three tons. On his way to Flint, a distance of 180 miles from where he had found the casings, they were in full view on his truck. He stopped several times at various places to do errands, also parked at a restaurant where he had something to eat. During these times, the truck was alongside the highway, and the casings were in view of any passer-by. Sometime later, when he was in Northern Michigan at Cheboygan to get Christmas trees, a state police officer stopped him and inquired about the casings. He told the officer that he had taken them and sold them for $28.00 a ton at Flint; and that he did not think they were any good or that anybody would care if he took them. An agent of the Federal Bureau of Investigation later called at his home and left word that he wanted to see him. As soon as Morissette received the message, he went to see the agent, told him that he had taken the casings and sold them at Flint, and repeated that he had thought they were no good to anyone.

Morrissette was later indicted for unlawfully, wilfully and knowingly stealing and converting the metal casings to his own use, in violation of Title 18 U.S.C.A. § 641.

The statute provides:

"Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof;

·   *    *    *    *    *    * ·

"Shall be fined not more than $10,000 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both. * * *"

The indictment against Morissette charged: "That on or about the 2nd day of December, A. D., 1948, at Oscoda, Michigan, in the Eastern District of Michigan, Northern Division, Joseph Edward Morissette, did unlawfully, wilfully and knowingly steal and convert to his own use about three tons of used bomb casings having a value of approximately $84.00, and being the property of the United States of America, located at the bombing range of the Oscoda Army Air Base, in violation of Section 641, United States Code, Title 18."

On his trial, Morissette testified that he did not intend to steal the property, and that he did not take the casings with any wrongful intent; and he stated that he thought they had been abandoned. Counsel for Morissette contended that he was entitled to show that there was no wrongful intent in taking the casings; and, furthermore, that the property had actually been abandoned. The trial court, however, referring to this contention and defense, said: "he took it because he thought it was

abandoned and he knew he was on government property. * * * That is no defense. * * * I don't think anybody can have the defense they thought the property was abandoned on another man's piece of property." The court, accordingly, refused to submit the question of Morissette's innocent or wrongful intent to the jury or allow it to be argued. The court stated: "I will not permit you to show this man thought it was abandoned. * * * I hold in this case that there is no question of abandoned property." On the question of intent, the trial court charged the jury: "And I instruct you that if you believe the testimony of the government in this case, he intended to take it. * * * He had no right to take this property. * * * and it is no defense to claim that it was abandoned, because it was on private property. * * * And I instruct you to this effect: That if this young man took this property (and he says he did), without any permission (he says he did), that was on the property of the United States Government (he says it was), that it was of the value of one cent or more (and evidently it was), that he is guilty of the offense charged here. If you believe the government, he is guilty. * * * The question on intent is whether or not he intended to take the property. He says he did. Therefore, if you believe either side, he is guilty." After the jury left, exceptions were taken, and counsel for appellant said:

"The objection is this, as I understand the court's charge, that the taking is the intent.

"The Court: No. I leave the question to them whether he intended to take it. He says he did.

"Mr. Transue: But the taking must have been with a felonious intent.

"The Court: That is presumed by his own act."

Upon this appeal, it is contended by appellant that where an act is made criminal by statute if "knowingly" committed, such act must be committed with wrongful or felonious intent; that where felonious intent is made an element of a crime, a specific criminal intent on the part of the accused must be proved; and that such criminal or wrongful intent is never presumed from the mere act, where wrongful intent is made an element of the crime. Counsel for Morissette submits that the question of the innocent or wrongful intent of the appellant in this case was a question of fact to be determined by the jury. Furthermore, it is contended that appellant was also entitled to have submitted to the jury the issue whether the property which he removed from the area had been abandoned.

In brief, appellant's chief contention is that he was entitled to have the court submit to the jury the question whether he took the property with felonious intent, and that the court, by its refusal to submit the question of his intent to the jury, committed reversible error.

In considering the issues, we come to the discussion of those cases where *scienter*, as an element of a statutory crime, is not expressed in the statute; where an act is made a crime if "wilfully" done; and where the act is made a crime, if "knowingly" done. Various of the statutes and indictments reviewed in the adjudicated cases, in referring to the commission of the offense charged, use the phrases "unlawfully and wilfully," "wilfully and knowingly," and "unlawfully, wilfully, and knowingly"; and many courts have passed upon the meaning to be given these different terms.

When used in a criminal statute, "wilfully" generally means an act done with a bad purpose; without justifiable excuse; stubbornly, obstinately, perversely; without ground for believing it is lawful; or conduct marked by careless disregard whether or not one has a right so to act. United States v. Murdock, 290 U.S. 389, 394, 395, 54 S.Ct. 223, 78 L.Ed. 381.

Whether *scienter* is a necessary element of a statutory crime, though not expressed in the statute, is a question of legislative intent to be answered by a construction of the statute. United States v. Balint et al., 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604. In the foregoing case, defendants were indicted for unlawfully selling a derivative of opium, and demurred on the ground that

the indictment failed to charge that they had sold the inhibited drug knowing it to be such. The court held that whether *scienter* was a necessary element in a crime was a question of legislative intent to be ascertained by the court. In that case, it is to be noted, however, that there was no provision in the statute making the act criminal if "knowingly" committed. It seems to follow, from the authority of the Balint case, that although *scienter* is not made an element of an offense, yet by construing the statute through ascertainment of the legislative intent, *scienter* may be found to be necessary to its commission. If the offense is statutory, and intent or knowledge is not made an element thereof, a conviction may be had upon proof of its commission. United States v. Reese, D.C. Tenn., 27 F.Supp. 833. In United States v. Schultze, D.C.Ky., 28 F.Supp. 234, where a certain act was declared unlawful in a criminal statute, it was held that a defendant might be guilty on commission of the act, even though there was no evidence of any guilty knowledge or intent upon his part. But the court emphasized that the statute in question had failed to use the word "willfully" or the word "knowingly" or any similar phrase.

In Mackey v. United States, 6 Cir., 290 F. 18, 20, the court had occasion to pass upon the question whether *scienter* was a necessary element of a given statutory crime, and in its consideration of the case, referred to the Balint case, remarking that the statute in that case did not make knowledge an element of the offense. The opinion went on to say that it was held in the Balint case that the manifest purpose and intent of Congress was to require every person dealing in drugs to ascertain at his peril whether that which he sells comes within the inhibition of the statute. The court observed that the Anti-Narcotic Act, there under consideration, was a regulatory measure, and quoted the Supreme Court, as follows: "Many instances are to be found in regulatory measures in the exercise of what is called the police power, where the emphasis of the statute is evidently upon the achievement of some social betterment rather than the punishment of the crimes as in cases of mala in se."

The court then went on to say: "In determining the legislative intent, consideration should be given to the nature of the offense with which the statute deals, and particularly where a crime involves moral turpitude and the statute does not describe the offense, but merely uses the common-law name, as 'larceny,' * * *. All the cases sustaining indictments which fail to aver scienter, to which our attention has been called, charged acts of commission in violation of prohibitory statutes, in which knowledge and intent was not made an element of the offense. In such cases there is a strong presumption that it was the legislative intent that averment and proof of scienter should not be required."

From the foregoing, the conclusion is evident that, in statutory crimes, generally, where the emphasis of the statute is upon some social betterment, *scienter* is not an element of the offense; but where the emphasis is upon the punishment of crime, as in cases of *mala in se, scienter* is a necessary element, even where not so specified in the statute.

It is said that the meaning of the word "willful" depends upon the nature of the criminal act and the facts of the particular case, and that it is only in a few criminal cases that "willful" means "done with a bad purpose"; that, generally, it means no more than that the person charged with the duty knows what he is doing; it does not mean that, in addition, he must suppose that he is breaking the law. Townsend v. United States, 68 App.D.C. 223, 95 F.2d 352, 358. But although it is within the power of the legislature to make an act criminal in the absence of criminal intent, yet where there is nothing in a statute to indicate an intent to punish an innocent, though intentional, taking away, the use of the term "willful" in reference to such taking, implies an evil intent without justifiable excuse. People v. Jewell, 138 Mich. 620, 101 N.W. 835. Wilfulness, it has been held, when used to characterize an act in the realm of criminal law, means more than mere voluntariness. "It implies a purposeful design to do a

thing with evil or illegal design." Bowles v. Jung et al., D.C.Cal., 57 F.Supp. 701, 709.

In Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 367, 87 L.Ed. 418, the court was confronted with the problem of the different meanings of the word "willful," as used in various sections of the Internal Revenue Code, and in discussing the distinction, said: "The difference between willful failure to pay a tax when due, which is made a misdemeanor, and willful attempt to defeat and evade one, which is made a felony, is not easy to detect or define. Both must be willful, and willful, as we have said, is a word of many meanings, its construction often being influenced by its context. * * * It may well mean something more as applied to nonpayment of a tax than when applied to failure to make a return. Mere voluntary and purposeful, as distinguished from accidental, omission to make a timely return might meet the test of willfulness. But in view of our traditional aversion to imprisonment for debt, we would not without the clearest manifestation of Congressional intent assume that mere knowing and intentional default in payment of a tax where there had been no willful failure to disclose the liability is intended to constitute a criminal offense of any degree. We would expect willfulness in such a case to include some element of evil motive and want of justification in view of all the financial circumstances of the taxpayer." In United States v. Perplies, 7 Cir., 165 F.2d 874, 876, the court, in distinguishing between the use of the word "wilful," as used in felony and in misdemeanor statutes, said: "The defendant asserts that the word 'wilful' as used in criminal statutes implies an evil intent or motive, and the court erred in the instant case by not so instructing the jury. We do not agree that in all criminal statutes the word 'wilful' must be so construed. The context of the statute in which the word 'wilful' is used is often most important. * * * In statutes involving moral turpitude and therefore constituting felonies, the word 'wilful' is usually given the meaning contended for by the defendant, but the use of the word 'wilful' is without such impli-cation in misdemeanor statutes. Fields v. United States, App.D.C., 164 F.2d 97, 100."

Whatever qualification there may be in the various cases in which an offense is made criminal by statute where "unlawfully" committed or "wilfully" committed, the decisions seem uniform that where an offense is made a crime by statute only where "knowingly" committed, it is necessary to prove felonious intent. In this case, the principal argument appellant submits to us is that he had the right to have the jury decide whether he took the property with felonious intent.

"Doing or omitting to do a thing knowingly and wilfully, implies not only a knowledge of the thing, but a determination with a bad intent to do it or omit doing it. 'The word "wilfully,"' says Chief Justice Shaw, 'in the ordinary sense in which it is used in statutes, means not merely "voluntarily," but with a bad purpose.' [Commonwealth v. Kneeland] 20 Pick. (Mass.) [206] 220. 'It is frequently understood,' says Bishop, 'as signifying an evil intent without justifiable excuse.' Crim.Law, vol. i., sect. 428." Felton v. United States, 96 U.S. 699, 702, 24 L.Ed. 875. Where an act must be "knowingly and wilfully" done to be criminal, not only a knowledge of the act is implied, but a determination with a bad intent to do it; and the presumption of wrongful intent, based upon the natural result of the words or acts, while constituting strong evidence of the presence of such intent, is not conclusive, but rebuttable. Such rebutting evidence may take the form of testimony by the defendant that he intended no such result. Bentall v. United States, 8 Cir., 262 F. 744, 746. In United States v. Starkey, D.C.Ill., 52 F.Supp. 1, 2, Judge Lindley, in a case in which a defendant was found guilty of a statutory offense, observed: "The word 'knowingly' in a criminal statute commonly means that state of mind wherein the person charged is in possession of facts under which he is aware he can not lawfully do the act with which he is charged." In Ex parte Stewart, D.C.Cal., 47 F.Supp. 415, 417, in passing upon the element of *scienter* in the violation of the Selective Training and Service

Act, 50 U.S.C.A.Appendix, § 301 et seq., it was said: "However, because the statute uses the word 'knowingly' (50 U.S.C.A. Appendix, § 311), which implies wilful knowledge and a specific intent, we have allowed defendants in Selective Service cases to give their reasons for failure to obey, as going to intent." Likewise, in United States v. Hoffman, 2 Cir., 137 F.2d 416, 419, it was held that to "knowingly fail or neglect" to perform a duty required by the Selective Training and Service Act, there must be present the usual criminal intent. In United States v. Martinez, D.C. Pa., 73 F.Supp. 403, 407, where a defendant attacked an indictment for failure to allege knowledge of defendant, the court considered the matter as one of form and held that in the ordinary acceptation, "the words 'unlawfully, willfully, and knowingly,' when applied to an act or things done, import knowledge of the act or thing so done, as well as an evil intent or bad purpose in doing such thing".

From the foregoing, it seems plain that the statute, in making criminal an act where one "knowingly" converts to his use government property, implied a conversion with bad purpose and evil intent. If more were required to sustain the conclusion that felonious intent was an element of the crime set forth in the statute, the meaning of the phrase, "knowingly converts to his use", could well be ascertained by reference to the other anomalous words associated with the statute under the doctrine of construction *noscitur a sociis*. The provision in the statute reads: "Whoever embezzles, steals, purloins, or knowingly converts to his use * * *." The terms, "embezzles," "steals," and "purloins," give color to the term "knowingly converts to his use." In Neal v. Clark, 95 U.S. 704, 24 L.Ed. 586, the Supreme Court had before it a statute which provided that no debt of a bankrupt created by his fraud should be discharged. The question was whether the statute referred to implied fraud, also known as fraud in law, or whether it meant positive fraud, or fraud in fact. In laying down the rule for the construction of the statute, the court said: "It is a familiar rule in the interpretation of written instruments and statutes that 'a passage will be best interpreted by reference to that which precedes and follows it.' So, also, 'the meaning of a word may be ascertained by reference to the meaning of words associated with it.' In Broom's Legal Maxims, p. 450, it is said: 'It is a rule laid down by Lord Bacon, that *copulatio verborum indicat acceptationem in eodem sensu,*—the coupling of words together shows that they are to be understood in the same sense. And where the meaning of any particular word is doubtful or obscure, * * * the intention of the party who has made use of it may frequently be ascertained and carried into effect by looking at the adjoining words. * * * 'In the construction of statutes, likewise, the rule *noscitur a sociis* is very frequently applied; the meaning of a word, and, consequently, the intention of the legislature, being ascertained by reference to the context, and by considering whether the word in question and the surrounding words are, in fact, *ejusdem generis,* and referable to the same subject-matter.' Applying these rules to this case, we remark, that, in the section of the law * * * which sets forth the classes of debts which are exempted from the operation of a discharge in bankruptcy, debts created by 'fraud' are associated directly with debts created by 'embezzlement.' Such association justifies, if it does not imperatively require, the conclusion that the 'fraud' referred to in that section means positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, as does embezzlement; and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality." 95 U.S. at pages 708, 709, 24 L.Ed. 586. With equal force it can be said in the instant case that the words, "knowingly converts to his use," coupled with the words, "embezzles, steals, purloins," involving moral turpitude, mean a conversion to his use, with evil intent—if such intent be an element of embezzlement, stealing, and purloining.

There is no question that to constitute embezzlement, there must be a fraudulent intent to deprive the owner of his property and appropriate the same; Hancey

v. United States, 10 Cir., 108 F.2d 835; Hubbard v. United States, 9 Cir., 79 F. 2d 850; Fortney v. Commonwealth, 290 Ky. 659, 162 S.W.2d 193; and such intent is always a question for the jury; Lindgren v. United States, 9 Cir., 260 F. 772. Stealing has frequently been said to be synonymous with larceny; and to purloin means to commit larceny or to steal. Thompson et al. v. United States, 2 Cir., 256 F. 616. It might be that because of the particular wording of a statute or on account of special circumstances, the terms "steal" or "purloin," as employed in a given case, would not import larceny. But here there is no reason to suppose that they do not.

Moreover, a resort to the history of the statute itself reveals that it is concerned with embezzlement and larceny. Title 18 U.S.C.A. § 641 (1950 Revised Ed.), consolidates Sections 82, 87, 100, and 101 of Title 18 U.S.C., 1940 ed. See Reviser's Notes Title 18 United States Code, Congressional Service, p. 2505 (1948 Ed.).

Title 18 U.S.C. § 82 (1940 Ed.), which was consolidated in the present Title 18 U.S. C.A. § 641, provided, in so far as here applicable, that "Whoever shall take and carry away or take for his own use, or for the use of another, with intent to steal or purloin" any property of the United States, would be punishable by fine or imprisonment or both. Title 18 U.S.C. § 87 (1940 Ed.), provided that "Whoever shall steal, embezzle, or knowingly apply to his own use," arms or property to be used for the armed forces should be similarly punished. Title 18 U.S.C. § 100 (1940 Ed.), provided that "Whoever shall embezzle, steal, or purloin any money, property, record, voucher, or valuable thing whatever" of the United States should be similarly punished. Title 18 U.S.C. § 101 (1940 Ed.), provided that "Whoever shall receive, conceal, * * * or shall have or retain in his possession * * * any money, property, * * * or valuable thing whatever, * * * of the United States, which has theretofore been embezzled, stolen, or purloined by any other person, knowing the same to have been so embezzled, stolen, or purloined," shall be similarily punished.

"Changes necessary to effect the consolidation (of the above sections) were made. Words 'or shall willfully injure or commit any depredation against' were taken from said section 82 *so as to confine it* (Section 641) *to embezzlement or theft.*" (Emphasis supplied.) Reviser's notes. Title 18 United States Code, Congressional Service, p. 2505 (1948 Ed.).

Prior to the consolidation of Title 18 U.S. C.A. § 87, in the present Section 641, it was held that such section dealt with "larceny." Price v. United States, 5 Cir., 74 F.2d 120. In Crabb v. Zerbst, 5 Cir., 99 F.2d 562, 564, it was observed that the counterpart of Title 18 U.S.C.A. § 100, which was repealed and re-enacted as a part of the Criminal Code of 1909, was included in the repealing section of the Code as "An Act to punish certain larcenies and the receivers of stolen goods". It was said by the court that the section denounced embezzlement by name, without definition; and then, to cover such cases as may shade into larceny, as well as any new situation which may arise under changing modern conditions and not envisioned under the common law, it added the words "steal or purloin." The court remarked that between embezzlement and larceny "there lies a gap which has grown wider and wider as the multifarious activities of the central government have spread and increased. Stealing, having no common law definition to restrict its meaning as an offense, is commonly used to denote any dishonest transaction whereby one person obtains that which rightfully belongs to another, and deprives the owner of the rights and benefits of ownership, but may or may not involve the element of stealth usually attributed to the word *purloin.* * * * Where the offense is embezzlement, or its nature so doubtful as to fall between larceny and embezzlement, it may be prosecuted under section 47." Title 18 U.S.C. § 100 (1940 Ed.) Crabb v. Zerbst, supra, 99 F.2d at p. 565.

Title 18 U.S.C. § 101 (1940 Ed.), which was consolidated in the present Section 641, relates only to the offense of receiving and concealing property of the United States, which has been embezzled, stolen, or pur-

loined by another, with knowledge of such embezzlement or theft.

That the phrase, "knowingly converts to his use", in a criminal statute, was intended by Congress to import larceny, seems clear from the employment of this particular language. It could not have been intended to mean a conversion merely in a civil sense, the commission of which is, in itself, the offense. Intent to convert to one's own use is, by the weight of authority, one of the elements of larceny. McIntosh v. State, 105 Neb. 328, 180 N.W. 573, 12 A.L.R. 798, with annotation; and in Bouvier's Law Dictionary, Rawle's Third Revision, one of the definitions of larceny is given as the felonious taking of the property of another without his consent and against his will, with the intent to convert it to the use of the taker. It seems a fair assumption that in drawing the statute, Congress considered that the felonious conversion of property of the government to one's own use, was larceny, and used conventional phrasing to express that intention.

An examination of the foregoing sections, and Section 641, in which they were finally consolidated, in the light of the words used in the sections themselves, the decisions of the courts, and the notes of the revisers of the present Criminal Code, leaves no doubt that the offenses made criminal by the latter section are embezzlement, larceny, and offenses falling between embezzlement and larceny, as well as the concealment of stolen property with knowledge that it has been stolen, or the application to one's own use of property furnished to the armed services, with knowledge that it had been stolen. We are not here concerned with embezzlement or concealment, or application to one's own use, of stolen property, but only with larceny, stealing, or purloining. The felonious taking and carrying away of property constitute the common law offense of larceny; and the modern tendency is to broaden the offense of larceny, by whatever name it may be called, to include such related offenses, which are often denominated "theft" or "stealing." Crabb v. Zerbst, supra, 99 F.2d at p. 564. From the foregoing, it can be said that, aside from extreme verbal re-finement, the offenses of stealing and purloining property and knowingly converting it to one's use, made punishable by the criminal statute in this case, are all equivalent to common law larceny.

In Frach v. Mass, 9 Cir., 106 F.2d 820, 821, the court said that "Larceny of property of the United States is made a crime by 18 U.S.C.A. § 82." That section, consolidated in present Section 641, as has been observed, referred to "Whoever shall take and carry away or take for his own use, * * * with intent to steal or purloin" property of the United States. In United States v. Anderson et al., D.C.Cal., 45 F. Supp. 943, 945, the court, in referring to Title 18 U.S.C.A. § 82, said: "This means of course, that in interpreting the statute, we may apply the principles governing the common law crime of larceny, as interpreted by the courts of various states."

On this general subject, it remains finally to be said that, from the language of the indictment and the brief of the district attorney, it appears that the government has always considered that Morissette was being proceeded against on an indictment for larceny, under a statute providing penalties for larceny. The indictment charges that appellant "did unlawfully, wilfully and knowingly steal and convert to his own use" the property in question. As heretofore outlined, the cases hold that a charge than an accused "unlawfully, wilfully and knowingly" committed an act condemned by a criminal statute, imports its commission with criminal or evil intent. The use of the phrase, "steal and convert to his own use" clearly charges larceny. The indictment itself is entitled, "(Theft of Government Property)." The citations in the government brief are principally concerned with the elements of larceny and the nature of the intent necessary to constitute the crime; and it is emphasized that, by any rule of law, appellant's act constituted the stealing of government property. Moreover, it appears that the government assumed that it was necessary to charge a felonious intent in this case for, in answer to appellant's contention that the indictment was defective for failure to charge such intent, it replied that the term "unlawful" (as

used in the indictment in this case) "is an adequate substitute for 'felonious,'"; and it further supported its argument by relying upon rulings that where an indictment for theft used the words "wilfully and unlawfully," rather than "knowingly" or "feloniously," it was unnecessary for the indictment "to contain such formal words, *where the allegations thereof necessarily or fairly import guilty knowledge."* (Emphasis supplied.)

That the government recognized from the foregoing that the conversion of which appellant is accused must be committed feloniously or with guilty knowledge is further pointed up in its brief where it argues that a jury may infer a man's intent from his acts, citing Harris et al. v. United States, 9 Cir., 48 F.2d 771. Strangely, that is exactly what appellant contends—that he was entitled to have the question of his innocent or felonious intent submitted to the jury, and the government agrees that felonious intent is an element of the crime charged against Morissette, when it argues that the district court was correct in holding that felonious intent was "presumed by his (Morissette's) own act." Thus, while it argues that the *"animus furandi* must accompany the taking to constitute 'larceny,'" it contends that here "the wrongful taking of property in itself imports the *animus furandi."*

At common law, the *animus furandi,* or specific intent to steal, is an essential element of the crime of larceny. Ryan v. United States, 26 App.D.C. 74. Where a crime consists of an act, combined with a specific intent, the intent is just as much an element of the crime as is the act. In such cases, mere general malice or criminal intent is insufficient, and the requisite specific intent must be shown as a matter of fact, either by direct or circumstantial evidence. Savitt v. United States, 3 Cir., 59 F. 2d 541. Proof of the commission of an unlawful act does not warrant the presumption that the accused had the requisite specific intent. United States ex rel. Kasparian v. Hughes, D.C., 278 F. 262. Where a statute, 18 U.S.C.A. § 87, provided that anyone who should steal, embezzle or knowingly apply to his own use property furnished to or to be used by the armed services, was guilty of a crime, and a person purchased property furnished for the armed services from a soldier at a price disproportionate to its value, it was held that such a purchase, when considered with other evidence, supported an inference of "guilty knowledge" on the part of the purchaser, "i. e., that he did 'knowingly apply to his own use' property of the United States; *that while so doing he knew the property was stolen."* (Emphasis supplied.) Adolfson v. United States, 9 Cir., 159 F.2d 883, 888. In passing upon the question of proving such guilty knowledge by all the surrounding facts and circumstances, the court said: "We regard this evidence as relevant and competent for the purpose of showing the charged 'guilty knowledge' as a *fact.* This because the existence of this 'knowledge' of the character and value of the property was a material and necessary element in the prosecution's chain of evidence, and it was therefore proper to submit it to the jury on the question of whether or not this guilty knowledge existed and was proven beyond a reasonable doubt." "The color of the act determines the complexion of the intent only in those situations where common experience has found a reliable correlation between a particular act and a corresponding intent." Hubbard v. United States, 9 Cir., 79 F.2d 850, 853. While a person is presumed to intend to do that which he does, and especially so when the things are done in the commission of a crime, nevertheless, such a presumption does not exist where specific intent must be proved as a necessary element of the offense. If it appears that a taking of property was consistent with honest conduct, although the party charged with the crime may have been mistaken, he can not be convicted of larceny. Flint v. State, 143 Fla. 259, 196 So. 619.

Every taking of another's property without legal justification is a trespass upon the owner's right to its continued possession, but it does not constitute a crime of larceny unless the act is perpetrated feloniously, that is, *animo furandi,* or with the intention to steal. Johnson

v. State, 73 Ala. 523; Rountree et al. v. State, 58 Ala. 381. An essential element of larceny is that the property of another, which is taken away without his consent, should be taken with a felonious intent. The crime implies theft, and one can not be deemed guilty of larceny, without felonious intent to deprive the owner of his property; and such intent must be proved. United States v. One 1941 Chrysler Brougham Sedan, D.C. Mich., 74 F.Supp. 970.

In Landen v. United States, 6 Cir., 299 F. 75, 78, 79, it is said: "The principle that even a mistake of law may protect one accused of crime has familiar illustration in the rule that, if the respondent in a prosecution for larceny took the property in a good-faith, though erroneous, belief that he had the legal right to its possession, he is not guilty."

In Hargrove v. United States, 5 Cir. 67 F.2d 820, 90 A.L.R. 1276, the court had occasion to review instruction to a jury in a criminal case in which the trial court had charged that the question of wilfullness and intent depended upon whether it found that the defendant wilfully and knowingly did what he intended to do; and that while a man might have no intention to violate the law, yet if he wilfully and knowingly did a thing which constituted a violation of the law, he violated the law. On appeal, these instructions were held erroneous and the judgment was reversed in an opinion in which it was said: "The court here fell into the error of not distinguishing between the elements of an offense, where the statute simply denounces the doing of an act as criminal, and where it denounces as criminal only its willful doing. In the first class of cases, * * * the law imputes the intent. * * * Had the prosecution here been under such a statute, the charge of the court would have been unexceptionable. In the second class of cases, a specific wrongful intent, that is, actual knowledge of the existence of obligation and a wrongful intent to evade it, is of the essence. * * * For this error the judgment is reversed * *. *." 67 F.2d at pages 823, 824.

The general rule that a criminal intention will be presumed from the commission of the unlawful act does not apply where *scienter* is an element of the crime; and proof of the commission of the act does not warrant the presumption that accused had the requisite specific intent. Felonious intent is not presumed. Hubbard v. United States, 9 Cir., 79 F.2d 850.

In United States ex rel. v. Hughes, D.C., 278 F. 262, 265, where an alien was accused of knowingly circulating printed matter advocating the overthrow, by force or violence, of the government of the United States, the court said: "That statutes creating an offense 'knowingly' committed import knowledge as to all the essential ingredients of the offense is an undoubted and well-recognized rule of construction and a reasonable one. If the mere distribution without further knowledge were sufficient, the word 'knowingly' would be superfluous, as one could not well distribute circulars without knowledge that he was distributing them."

As an instance of evidence of intent, the accused is entitled to introduce any fact which tends to disprove a felonious intent, and his conduct in connection with the act of taking, such as, that he took the property openly in the presence of others, and made no effort to conceal his taking or possession. See Johnson v. State, 73 Ala. 523. And where the accused has requested a charge that if the taking was open, a presumption arises that there was no felonious intent, it is held that refusal so to charge was error. Bivins v. State, 24 Ala.App. 373, 135 So. 603; Floyd et al. v. State, 23 Ala.App. 216, 123 So. 103.

From the foregoing, we are constrained to hold that the trial court, in the instant case, erred in instructing the jury that felonious intent was presumed from the act of appellant in taking the casings, and, further, that the fact that he knowingly took them imported intent on his part—specific wrongful intent. The intent of appellant was the crucial point in the case. Whether his intent was innocent

or wrongful was a question for the determination of the jury.

In addition to the issue of intent, in this case, there is also the question of abandonment. Abandonment is the intentional relinquishment of a known right to property. New Jersey Zinc Co. v. Signmaster et al., D.C.N.Y., 4 F.Supp. 967. It means virtually throwing the property away; it is a relinquishment of property to which a person is entitled, with no purpose of again claiming it, and without concern as to who may subsequently take possession of it. Wilmore Coal Co. v. Brown et al., 147 F. 931. If an owner throws the property away or voluntarily forsakes it without any intent to repossess it or reclaim it, it becomes abandoned. Summers v. Atchison, T. & S. F. Ry. Co., D.C., 2 F.2d 717; Helvering v. Jones, 8 Cir., 120 F.2d 828; Equitable Life A. Soc. v. Mercantile-Commerce B. & T. Co., 8 Cir., 155 F.2d 776. It is said that the act of abandonment may be by an overt act or some failure to act which carries the implication that the owner neither claims nor retains any interest in the subject matter of the abandonment. Landay v. MacWilliams, 173 Md. 460, 196 A. 293, 114 A.L.R. 984. The primary elements of abandonment are the intention to abandon and the external act by which the intention is carried into effect; and the intent to abandon need not appear by express declaration of the party, but may be inferred from the situation of the property. Log-Owners' Booming Co. v. Hubbell, 135 Mich. 65, 97 N.W. 157, 4 L.R.A.,N.S., 573. Ordinarily such intent may be ascertained from the acts and conduct of the owner; City of New London v. Pequot Point Beach Co. et al., 112 Conn. 340, 152 A. 136; but whether there has been an intent to abandon and an abandonment is a question of fact to be determined by the jury under all the circumstances of the case. Kister Oil Development Corp. v. Young et al., D.C., 27 F.2d 433; Wilmore Coal Co. v. Brown et al., supra; Cadillac Oil & Gas Co. v. Harrison et al., 196 Ky. 290, 244 S.W. 669. It is the exclusive province of the jury to determine the intent with which the accused performed the alleged criminal act

relied upon to establish the felonious taking and carrying away of the property, and the accused person may testify as to the intent with which he took the property. State v. Williams, 95 Mo. 247, 8 S.W. 217.

Where one takes personal property into his possession in the honest belief that it is abandoned by its owner, he is not guilty of larceny. Johnson v. State, 36 Tex. 375; Jordan v. State, 107 Tex.Cr.R. 414, 296 S.W. 585.

There is no reason why the government may not abandon property as well as an individual. The fact that, in taking abandoned property, a trespass is committed upon the land of one who has abandoned it, does not change innocent intent into felonious intent, or alter the fact that the property may have been abandoned. Such a trespass would be a circumstance to which much importance might be attached by the jury in determining the intent with which the property was taken, as well as in determining whether the property had been abandoned. But such a trespass is not conclusive on the question of a wrongful taking. In Bodee et al. v. State, 57 N.J.L. 140, 30 A. 681, where the accused was charged with stealing coal from a railroad right-of-way and his defense was that he thought the coal had been abandoned, it was held that testimony was admissible to show a practice of owners of coal on the one hand, and of poor people on the other, with regard to gathering up coal dropped in unloading cars, on the issue whether the owners had abandoned such coal, and whether others who picked it up thought that it was abandoned.

In the instant case, it appears that, in spite of warning signs, the area of the bomb base was used by many hunters for deer hunting. It was a wild place, largely woodland, and was located in the hunting country. The fact that it was leased from the state for the purpose of permitting the dropping of the casings to simulate bombs is not conclusive proof that the government did not abandon the casings after they had been exploded and cleared off the target area. Of course, it could not reasonably be contended that one who removed property from the home or from

the immediate personal possession of another did so in the belief that it was abandoned; nor, in such a case, could one rely upon the claim that it actually had been abandoned; but that is not this case. The question of wrongful or innocent taking, or whether the property was abandoned, must be judged according to the facts of each case.

On the question of abandonment, appellant testified that he removed the casings because he thought they were abandoned. They had been cleared off the range to get them out of the way after they had been used, and were piled up in a heap in the midst of the woods at a considerable distance from the nearest road. They were exposed to the weather and were pretty well rusted out. Some were practically decomposed, and others were in the process of decomposition. Photographs taken of another pile in the woods, which admittedly was similar to the one from which Morissette took the casings, showed a disorderly heap of bent, crushed, and disintegrating metal casings, giving an impression of a deserted pile of disused junk. There seems to have been nothing to indicate to anyone that the casings were to be used again, and the fact that they had been allowed to lie in the open weather for several years might indicate to an ordinary man either that someone in authority was culpable in allowing the casings to decompose, rust away, and become worthless and useless, or that they were considered of no further use or value and had, accordingly, been discarded and thrown away. The evidence submitted by appellant, under the issues in the case, required submission to the jury, not only of appellant's good faith and innocent intent in taking the casings, but also the question whether the property had been abandoned by the government, for even without direct proof of intent to abandon, the jury could, under the circumstances of this case, draw reasonable inferences that the government had intended to, and did, abandon the property. The district court, in my opinion, therefore, erred in refusing to permit the introduction of evidence of abandonment, and in refusing to submit to the jury for its determination whether the property had been abandoned.

The main issue in the case, however, was whether appellant was entitled to have the jury decide he had taken the property innocently or with felonious intent. In refusing to permit this issue to be decided by the jury, the district court, in my opinion, committed reversible error.