Frank SOUZA, Appellant,

v.

UNITED STATES of America, Appellee.

No. 17443.

United States Court of Appeals Ninth Circuit.

May 31, 1962.

Rehearing Denied July 10, 1962.

A. Peter Howell, Honolulu, Hawaii, for appellant.

Herman T. F. Lum, U. S. Atty., and Joseph M. Gedan, Asst. U. S. Atty., Honolulu, Hawaii, for appellee.

Before BARNES, JERTBERG and MERRILL, Circuit Judges.

JERTBERG, Circuit Judge.

Appellant appeals from a judgment of conviction upon three counts of a four-count information charging violation of Title 18 U.S.C.A. § 641.[1]

Count I of the Amended Information charged:

"That from on or about June 10, 1960, through August 8, 1960, in the District of Hawaii and within the jurisdiction of this Court, and within the special maritime and territorial jurisdiction of the United States, namely, Waipio Point Storage Area, Pearl Harbor, Oahu, FRANK SOUZA did unlawfully steal property of the United States, having a value in excess of $100.00, namely, 5,596 pounds of copper nickel, more or less, in violation of Title 18, United States Code, Section 641."

Count II charged:

"That on or about June 10, 1960, in the District of Hawaii and within the jurisdiction of this Court, FRANK SOUZA, the identical person named in Count I of this In-

formation, did, without authority, sell and convey property of the United States, having a value in excess of $100.00, namely, 1,660 pounds of copper nickel, more or less, in violation of Title 18, United States Code, Section 641."

Counts III and IV charged offenses which were identical to Count II except in respect to date and quantity of copper nickel involved. The date alleged in Count III is July 27, 1960, and the quantity of copper nickel alleged is 3,096 pounds. In Count IV, the date alleged is August 4, 1960, and the quantity of copper nickel alleged is 840 pounds.

The jury acquitted appellant of the offense alleged in Count I, and convicted him of the offenses charged in Counts II, III and IV.

The specifications of error relied upon by appellant are:

1. That each of Counts II, III and IV fails to state an offense under § 641;

2. That the evidence is insufficient to support the jury verdict of Guilty as to each of said counts;

3. That the District Court erred in failing to give an instruction to the jury proposed and offered by appellant;

4. That the District Court erred in furnishing to the jury a copy of the Information; and

5. That the District Court erred in receiving into evidence, over appellant's objection, an exhibit consisting of a bolt cutter.

The above specifications of error will be considered seriatim.

1. "Public money, property or records
"Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or
"Whoever receives, conceals, or retains the same with intent to convert it to his

use or gain, knowing it to have been embezzled, stolen, purloined or converted—
"Shall be fined not more than $10,000 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.
"The word 'value' means face, par, or market value, or cost price, either wholesale or retail, whichever is greater. June 25, 1948, c. 645, 62 Stat. 725."

In considering appellant's contention that each of said counts fails to state an offense under § 641, it is to be noted that the charge in each count is laid in the language of the statute and that such language does not provide that the acts denounced in the statute must be accompanied by criminal intent on the part of the perpetrator.

■ Appellant earnestly urges that the judgment of conviction must be reversed because Counts II, III and IV fail to state that the sales therein alleged were made "with criminal intent, that is, with knowledge that the property belonged to and was stolen from the United States Government." In Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), the indictment charged that on a certain date, at a certain place, Morissette "did unlawfully, wilfully and knowingly steal and convert to his own use about three tons of used bomb casings having a value of approximately $84.00, and being the property of the United States of America, located at the bombing range of the Oscoda Army Air Base, in violation of Section 641, United States Code, Title 18." At Morissette's trial, the District Court ruled that criminal intent was to be presumed from the acts charged in the indictment, and refused to submit or to allow Morissette's counsel to argue to the jury whether Morissette acted with innocent intent. On appeal to the Court of Appeals, Sixth Circuit, Morissette's conviction was affirmed. Morissette v. United States, 187 F.2d 427 (6th Cir., 1951). The Circuit Court construed § 641 to create several separate and distinct offenses, one being known as conversion of government property, and held that this particular offense requires no element of criminal intent. It was the Court's view that such conclusion was required by the failure of Congress to express such a requisite and by earlier decisions of the Supreme Court of the United States. On certiorari to the Supreme Court of the United States, the Court found no grounds for inferring affirmative instruction from Congress to eliminate intent from the offense charged against Morissette, and reversed the judgment of conviction. In the course of its opinion, the Supreme Court stated, at p. 263, 72 S.Ct. at p. 249.

"We hold that mere omission from § 641 of any mention of intent will not be construed as eliminating that element from the crimes denounced."

While it is to be noted that in Morissette, the Supreme Court considered only that part of § 641 which makes it an offense to embezzle, steal, purloin, or knowingly convert to his own use or the use of another of property of the United States, and not that part of the Section under which appellant was charged which makes it an offense to sell, without authority, property of the United States, we believe that the reasoning of the Supreme Court in Morissette compels the conclusion that criminal intent is an essential element of the offenses set forth in Counts II, III and IV.

However, in our view, the omission from Counts II, III and IV of an allegation of criminal intent does not require a reversal of the judgment of conviction in this case.

In this case, appellant concedes that the District Court instructed the members of the jury that in order to find the defendant guilty of the offenses charged in Counts II, III and IV, they must find that appellant sold and conveyed the property described in each such count, without authority, and with knowledge that at the time of each such sale and conveyance, the property belonged to the United States and had been stolen from the United States. In this connection, the record discloses that appellant moved the District Court for a judgment of acquittal as to Counts II, III and IV on the ground that each such count failed to state an offense because of the absence of any allegation of criminal intent. In denying such motion, the District Court stated: "I will charge the jury that specific intent is a necessary element of the offense." Included in the District

Court's instructions to the jury, we find the following:

"Now, the elements of the offenses charged in each of Counts 2, 3 and 4 are applicable to each and they are as follows: First, that on or about the dates charged the Defendant did sell and convey the property referred to in Counts 2, 3 and 4; second, that at the time of the selling the property belonged to the United States or an agency thereof; and, third, that when the Defendant sold the property, he had the specific intent to sell the property without lawful authority, knowing it was property owned by and stolen from the United States; and, fourth, that the property sold was of a value in excess of $100. * * * Now, if you find that these four elements, namely, selling and conveying of property owned by the United States, the selling being by the Defendant with specific intent to sell property without lawful authority, which property he knew was property of the United States or an agency thereof, and that this property was of a value greater than $100, if each and all of those are established beyond a reasonable doubt, then it is your duty to convict as to any count or counts to which you so find. On the other hand, if any one or more of these elements is not so established, then it is equally your duty to acquit the Defendant as to such count or counts as you may so find. * * *

"A criminal offense always consists of a commission or omission of a particular act, coupled with the simultaneous criminal intent of the person committing the act. Therefore, criminal intent is an essential ingredient of every crime. * * *."

Not only was the jury instructed that the prosecution was required to prove beyond a reasonable doubt that the property described in Counts II, III and IV was the property of the United States, that the same was sold or conveyed by appellant without authority, and that each sale or conveyance was made by appellant with knowledge on his part of ownership of the property by the United States, but also with knowledge that the property had been stolen from the United States. Certainly appellant suffered no prejudice insofar as the District Court's charge to the jury is concerned by the absence from Counts II, III and IV of an allegation of criminal intent. The record further discloses that appellant suffered no prejudice in other respects by such omission. Appellant has made no showing on his appeal that Counts II, III and IV did not fairly apprise him of the charges which he had to meet in order to prepare all defenses within his power to offer. The truth of such statement is reflected in the opening statement to the jury of appellant's counsel wherein he stated:

"Ladies and gentlemen, I represent the Defendant, Frank Souza. The issues in this case are simple, as Mr. Dudley [counsel representing the United States] has pointed out.

"Mr. Souza denies taking the property in question. He admits selling it to various scrap iron dealers, but he denies that he took it from the U. S. Navy or stole it. He came in the possession of this property honestly and without any knowledge that this property belonged to the United States Government. We intend to prove that, and at the end of the case we will ask you for an acquittal on all counts. Thank you."

It is also clear that Counts II, III and IV are so specific as to dates and description of property, that should appellant ever again be brought to trial for the same offenses, he is in a position to plead former conviction and thus avoid any danger of being placed twice in jeopardy for the same offenses.

In considering appellant's specification of error that the evidence is insufficient to support the Guilty ver-

dicts, we must take the view of the evidence most favorable to the prevailing party. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Schino v. United States, 209 F. 2d 67 (9th Cir., 1953), cert. denied, 347 U.S. 937, 74 S.Ct. 627, 98 L.Ed. 1087. We must also bear in mind that the members of the jury are the sole judges of the credibility of the witness and the weight to be given to the testimony of the witness. Viewed in the light most favorable to the government, the evidence may be thus summarized.

Naval supplies for the Inactive Service Craft Facility (commonly known as the "mothball fleet") which were located at Middle Lock, Pearl Harbor, were stored in the Waipio Point Storage Area. Included in such supplies were about 200 boxes containing copper nickel alloy tubing, which tubing was used primarily in steam condensers aboard Navy floating dry docks or ships.

Originally this tubing had been stored at the Damon Tract Supply Area of the Naval Supply Center, Pearl Harbor, which was a few miles from the Waipio Point Storage Area. In 1957, the Navy had planned to dispose of this tubing together with large quantities of other materials as surplus property by auction to the general public. However, in March of 1957, the Navy Public Works Office requested the withdrawal of six lots of copper nickel tubing in order to store it for future use by the Inactive Service Craft Facility. Thereafter and prior to the public sale, six lots consisting of 29,730 pieces of ⅝" and ¾" diameter copper nickel tubing were withdrawn from sale, and arrangements were made for transfer and delivery of these to the Waipio Point Storage Area.

Waipio Point Storage Area is a part of a peninsula located at Pearl Harbor. It was stipulated by counsel that the area was used by and was within the jurisdiction of the United States.

The Waipio Point Storage Area was bordered on two sides by a barbed wire fence from three to three and one-half feet high and on the other side by the waters of Pearl Harbor. There was a gate to the area coming in from a road leading to the main highway known as Farrington Highway.

The tubing had been previously packed in wooden crates which were marked with the catalog numbers used when the property was advertised to the public for bids and marked, "Condition—unused good." There were about 250 crates which had been transferred to the Waipio Point Storage Area, and each crate contained about 125 lengths of tubing. The tubing ranged in length from 11½ feet to 12½ feet and weighed approximately 3¼ to 4 pounds apiece.

A witness testified that he saw the crates at the Damon Tract Storage Area prior to their withdrawal from sale in March of 1957. Some of the crates had been opened for inspection by prospective bidders and the copper nickel tubing within was exposed. In September of 1960, the same crates, which were then stored at the Waipio Point Storage Area, were identified by their original sales catalog numbers.

The crates of tubing, after delivery to the Waipio Point Storage Area, were placed in three large stacks from six to ten feet apart out in the open. There were a little over 200 crates and four to six of the boxes on top of the stacks were without lids. However, the rest appeared fairly secure. The crates were located about 50 yards from the fence bordering the canefields.

In August of 1960, it was discovered that 95 of the cases had been opened, apparently from pilferage. The remaining 105 crates were still sealed. A piece of tubing which had been taken from one of the crates in the area was received in evidence.

No withdrawals of the tubing had been made through official channels from October 27, 1958 to the date of the trial, and no requests had been made by anyone in the Inactive Service Craft Facility for such tubing. Appellant had no authority to sell government property.

During the early part of 1958, as well as the first half of 1960, appellant worked in the Waipio Point Storage Area along with one Clarence Castro, another employee.

In the latter part of 1959, a bolt cutter was issued by the Public Works Center, United States Navy, to said Castro (of which fact appellant had knowledge), which bolt cutter was never returned to the Public Works Center. A bolt cutter, similar to the one issued to Castro, was received in evidence, as well as a cut piece of copper nickel tubing taken from the remaining supply at the Waipio Point Storage Area which had been cut by the bolt cutter. There was also received in evidence a cut piece of copper nickel tubing which admittedly had been sold by the appellant.

Appellant sold various quantities of copper nickel tubing to two different scrap metal dealers. On July 27, 1960, he sold 3,096 pounds of copper nickel tubing for $526.32. Payment therefor was made by check payable to appellant's order and endorsed by him. On August 4, 1960, appellant sold 840 pounds of copper nickel tubing to the same purchaser for $142.80 in cash. The tubing sold was in five-foot lengths, and samples of the tubing were received in evidence. On June 10, 1960, appellant sold 660 pounds of copper nickel tubing to another purchaser, receiving therefor a check in amount of $282.20. This tubing was in ten-foot lengths and in the shape of a "U".

Upon being twice interviewed in the early part of August, 1960, concerning any knowledge that he might have of copper nickel tubing missing from the Waipio Point Storage Area, appellant denied any knowledge thereof. Thereafter, when again interviewed and shown a piece of copper nickel tubing which had been taken from the Waipio Point Storage Area, appellant again denied any knowledge. However, when told that he had sold tubing of that same type to a scrap metal dealer and had received a check in payment therefor, appellant acknowledged that he had sold one lot and received a check in payment therefor.

Appellant stated that this was the only lot of tubing that he had sold and that he had purchased this tubing over a period of time from "some boys," and that he also had picked it up over a period of time. Upon being told it was unlikely that small boys would be peddling this type of material, appellant stated that he had purchased it, instead, from a middle-aged Portuguese man whom he had never seen before, whom he could not describe or name, and who had driven up with this material loaded on a truck. Upon being questioned regarding another sale by appellant to the same scrap metal dealer, appellant stated that he had made such sale, and then stated, "I had better say no more. I prefer to say no more about it because I know I'm wrong, eh?"

At the trial appellant testified that he had previously been employed on a part-time basis by a scrap iron dealer, and on two occasions in 1960, had purchased copper nickel tubing for approximately $450.00 from a Portuguese man by the name of "Blackie," which tubing he had thereafter sold. It appears that appellant reported to the person who prepared his Income Tax Return the proceeds derived from the sales of the tubing but did not report the cost to him of acquiring the same.

Appellant's argument in support of his contention as to the insufficiency of the evidence appears to be based upon two grounds: First, that his acquittal on Count I conclusively establishes that there had been no theft of the tubing and, hence, no basis remains in the evidence to support the Guilty verdicts on Counts II, III and IV; and, second, that the government failed to prove that the tubing sold by him was the property of the United States. We find no merit in either ground. The theft of this property and the unauthorized sale thereof are not one and the same crime. Thomas v. United States, 249 F.2d 429 (9th Cir., 1957), cert. denied, 355 U.S. 936, 78 S.Ct. 421, 2 L.Ed.2d 418. There is abundant evidence in the record from which the jury could infer that the copper nickel tubing sold by

appellant, admittedly without authority, was the property of the United States. There is ample evidence in the record from which the jury might infer that at the time of the sales of copper nickel tubing made by appellant, he knew that such copper nickel tubing was the stolen property of the United States. Such inferences are easily drawn from the testimony which we have summarized, and we see no need for further elaboration.

Appellant's next contention relates to the failure of the District Court to give his offered Instruction No. 3. Counsel for appellant concedes that no objection was made to the failure of the Court to give the requested instruction and that no objection was made to any of the instructions given. Notwithstanding Rule 30 of Federal Rules Criminal Procedure, 18 U.S.C.A., which provides that no party may assign as error any portion of the charge or omission therefrom unless he objects thereto, we have examined the offered instruction and find that the subject matter thereof was substantially covered by the instructions given by the Court and quoted earlier in this opinion. We find no error.

Appellant next contends that the District Court prejudicially erred in furnishing to the jury upon its retirement to deliberate, a copy of the Information. Appellant concedes that no objection was made when the Court stated that it intended to do so. The record does not disclose, with any certainty, whether a copy of the Information was in fact furnished to the jury. In any event, such procedure rests in the sound discretion of the District Judge, and in the absence of some showing of an abuse of discretion, his action is to be deemed proper. We find no error.

Appellant's last contention is that the District Court erred in admitting into evidence the bolt cutter, mentioned previously in this opinion, on the ground that proper foundation was not laid therefor. The bolt cutter received in evidence was identical with the bolt cutter which had been issued to Clarence Castro and not returned by him. There

is evidence in the record that while working at the Waipio Point Storage Area, appellant worked with Castro. There was before the jury cut tubing recovered from scrap dealers who had purchased it from appellant. There was likewise before the jury a sample piece of tubing cut by the bolt cutter which was received in evidence. From all of this, the jury may have derived some probative value. We find no prejudicial error in the District Court's ruling.

The judgment of conviction appealed from is affirmed.